UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

(Alexandria Division)

| | | |
|---|---|---|
| JOYCE and LOUIS THOMPSON, | ) | |
|   Personal Representatives of | ) | |
|   The Estate of Paul Thompson, | ) | |
| | ) | |
|      Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. #1:24-cv-1736 |
| | ) | |
| MEDIKO, INC.,  SHADI AYYAS, | ) | <u>COMPLAINT</u> |
|   DR. AYALES,  MOHAMMED AZAM, | ) | |
|   TATIANA CAMPBELL,  MARK CASSIDY, | ) | |
|   CAROL CHIKE,  SHENITA COOPER, | ) | |
|   MICHAEL DERARA,  AKAME EKWE, | ) | |
|   BEVERLY FRANKS,  JAVIER GARCIA-RUIZ, | ) | |
|   AUBREY GRAHAM,  DR. IJEH, | ) | |
|   DONNA McKAY,  ROBYN MAAS, | ) | |
|   DR. NUNEZ,  ABU SMITH, | ) | |
|   DAWN TREESE-SCOTT, | ) | |
|   SAMANTHA SLYDELL,  CYNTHIA TAFERI, | ) | |
|   JEANIE YOON,  C.M. PRASAD, | ) | |
|   ARLINGTON COUNTY COMMUNITY | ) | |
|     SERVICES BOARD, | ) | |
|  VIRGINIA HOSPITAL CENTER, | ) | |
|   ARLINGTON HEALTH SYSTEM, | ) | |
|  VIRGINIA HOSPITAL CENTER PHYSICIAN | ) | |
|    GROUP LLC, and C.M. PRASAD M.D. P.C., | ) | |
| | ) | |
|     Defendants. | ) | |

<u>Introductory and Jurisdictional Statement</u>

1.  Paul Thompson was a mentally ill and homeless man who was arrested for trespassing at a local mall and then incarcerated at the Arlington, Virginia Adult Detention Center after refusing to give his name to the police or a presiding magistrate.  Jailed as a "John Doe," he sat continuously in a wheelchair given him at the jail and  refused to take medication prescribed for an increasingly dire medical condition in his legs.  Jail staff transferred him on an emergency

basis to defendant Virginia Hospital Center, where emergency department doctors promptly sought and secured a medical temporary detention order ("TDO") permitting his involuntary medication, intravenously and via injection. Once removed from the emergency department, and in defiance of the TDO that had just been obtained, medical and nursing personnel did not continue to treat Mr. Thompson and simply noted his refusal of ongoing medication. It was known that Mr. Thompson's hospitalization resulted from his steadfast refusal to take prescribed medication at the jail, and that jail staff had cautioned the hospital that Mr. Thompson was expected to continue refusing to take any medication once returned to jail. Nonetheless, after keeping Mr. Thompson in the hospital a single night, and without securing a new involuntary medication order, defendant Dr. Jeanie Yoon discharged him back to the jail with five days of *oral* antibiotics. This was after defendant C. M. Prasad, a psychiatrist, found Mr. Thompson to be "confused, disorganized, uncooperative, catatonic, poorly interactive isolated, poorly interactive mute, depressed, sad, irritable, disorganized thought process, appears to be responding to internal stimuli, impaired cognitive and memory function, insight impaired, judgment impaired" (*sic*). While Dr. Prasad recommended ongoing involuntary medication of Mr. Thompson, neither he nor Dr. Yoon, Mr. Thompson's attending doctor, undertook to secure a supplemental order permitting such involuntary treatment. Having been returned to the jail, Mr. Thompson persisted in taking no medicine, and for the next eleven days sat and slept in his wheelchair. Despite the risks to Mr. Thompson's health that had led the jail's health-care staff to seek his emergency hospitalization, the sum total of the health "care" Mr. Thompson received during the eleven days following his one-day hospitalization amounted to entries in his health-care log that he was refusing all care. After eleven days, defendant medical and mental health care personnel at the jail belatedly

acknowledged that Mr. Thompson's dire medical condition made it necessary for him to be transported back to the hospital and a new medical TDO secured permitting his involuntary medication.  But lacking sufficient training and supervision, this too they did not accomplish promptly, and before they took effective action, Mr. Thompson was found dead in his cell.  In this lawsuit, Mr. Thompson's parents and personal representatives of his estate now sue his health-care providers at the hospital and at the jail for causing his final suffering and death.  This case arises under the 14th Amendment of the United States Constitution, 42 U.S.C. §1983, and the Affordable Care Act, 42 U.S.C. §1811 *et seq*.[1]  The Court has jurisdiction under 28 U.S.C. §1331.  The case also presents state law claims arising out of the same nucleus of operative facts as give rise to the federal claims, and over which this Court has supplementary jurisdiction under 28 U.S.C. §1367(a).

<u>Parties</u>

2.  Plaintiffs Joyce and Louis Thompson are the parents and duly appointed personal representatives  of the estate of the late Paul Thompson ("Mr. Thompson").  On January 31, 2024 – the day before the statutory period of limitations expired – they filed *Thompson v. Ayyas,* No. CL24001097 in Alexandria Circuit Court, setting forth the same cause of action presented here.  The circuit court lawsuit, never served, was non-suited pursuant to CODE OF VA. §8.01 on August

---

[1]In the event the Court sees fit to assess a qualified immunity defense mounted by any defendant under an Eighth Amendment standard, plaintiffs present facts supporting their constitutional claims sufficient under that amendment as well as the Fourteenth Amendment to the United States Constitution.  *See Mays v. Sprinkle*, 992 F. 3d 295 (4th Cir. 2021).

26, 2024.  This complaint is timely under CODE OF VA. §8.01-299(E)(3).[2]  Mr. Thompson is survived by his parents and his brother Carlton Thompson.

3.    Defendants Shadi Ayyas, Dr. [FNU] Ayales, Mohammed Azam, Tatiana Campbell, Mark Cassidy, Carol Chike, Shenita Cooper, Michael Derara, Akame Ekwe, Beverly Franks, Javier Garcia-Ruiz, Aubrey Graham, Dr. [FNU] Ijeh, Robyn Maas, Donna McKay, Dr. [FNU] Nunez, Abu Smith, Dawn Treese-Scott, Samantha Slydell, and Cynthia Taferi ("the jail defendants") were, at all relevant times, health care providers at the Arlington County Adult Detention Center (hereafter "jail") who interacted with or supervised those interacting with Mr. Thompson during his incarceration.  On information and belief, Dr. Ayales (or Ayyas) was a medical doctor, Dr. Ijeh a psychiatrist, Akame Ekwe a psychiatric nurse practitioner, Dr. Nunez the chief medical officer, Mr. Cassidy Mediko's chief operating officer, Aubrey Graham the jail-based behavioral health manager, and the other named defendants nurses.  The jail defendants were all employees or agents of defendant Mediko Inc. or of defendant Arlington County Community Services Board ("CSB").[3]

4.    Defendant Mediko Inc. is a corporation licensed and at all relevant times under contract to provide for-profit health care to jail inmates, including Mr. Thompson.  It was responsible for

---

[2]The undersigned learned of this case days before the expiration of the two-year statutory period of limitations on February 1, 2024, and was retained on January 24, 2024.  Lacking time to complete due diligence or secure necessary certifications under CODE OF VA. §8.01-20, on January 31, 2024 the undersigned filed *Thompson v. Ayyas,* No. 24001097 to preserve any potential claims**.**

[3]Documentation and information available to the undersigned to date has not permitted identification of which employer – Mediko or CSB – employed which individual jail defendant, nor any of their respective supervisory or training roles.  This information will be sought informally and in discovery, and a motion to amend the complaint filed if necessary.

training and supervising its employees, including persons named in ¶3, *supra.* Defendant Mediko functioned as a state actor in providing necessary health services to inmates incarcerated in the jail, a facility receiving financial assistance under programs funded by the federal government and governed by the Rehabilitation Act of 1973, 29 U.S.C. §794(a) *et seq.* and the Affordable Care Act, 42 U.S.C. §1811 *et seq.* ("ACA").[4]

5. Defendant CSB is a suable agency of Arlington County responsible, together with defendant Mediko, for the provision of mental health services to inmates of the jail, including Mr. Thompson. On information and belief it was responsible for training and supervising its employees providing services in the jail, including persons named in ¶3, *supra.*[5] Defendant CSB is a government program receiving financial assistance under programs funded by the federal government and governed by the Rehabilitation Act of 1973, 29 U.S.C. §794(a) *et seq.* and the Affordable Care Act, 42 U.S.C. §1811 *et seq.* ("ACA").

6. Defendant Virginia Hospital Center Arlington Health System is a non-stock corporation that owns and operates a general hospital known as Virginia Hospital Center in Arlington Virginia ("the hospital"). It receives financial support from federally funded programs for its work and is governed by the Rehabilitation Act of 1973, 29 U.S.C. §794(a) *et seq.* and the Affordable Care Act, 42 U.S.C. §1811 *et seq.* ("ACA").

---

[4]Plaintiffs do not know, but will learn in discovery, if Mediko received Medicaid or Medicare payments for any of their work at the jail. If so, this would be an alternative basis for application of the ACA to its work.

[5]For ease of reference, all persons and entities providing health services at the jail are referred to herein as the "jail defendants."

7.  Defendants C. M. Prasad and Jeanie Yoon are physicians who at the relevant time worked at the hospital, with Mr. Thompson briefly being one of their patients.  Dr. Prasad is a psychiatrist and Dr. Yoon, an internist.  They receive financial support from federally funded programs for their work and are governed by the Rehabilitation Act of 1973, 29 U.S.C. §794(a) *et seq*. and the Affordable Care Act, 42 U.S.C. §1811 *et seq*. ("ACA").

8.  Defendant Virginia Hospital Center Physician Group LLC. ("VHC LLC"") is a limited liability corporation that employs and provides doctors working at the hospital.  On information and belief, defendant Dr. Yoon is an employee or member of VHC LLC.  VHC LLC receives financial support from federally funded programs for its work and is governed by the Rehabilitation Act of 1973, 29 U.S.C. §794(a) *et seq*. and the ACA.

9.  Defendant C.M. Prasad M.D. P.C. is a professional corporation whose principal is defendant C. M. Prasad.  C.M. Prasad M.D. P.C. receives financial support from federally funded programs for its work and is governed by the Rehabilitation Act of 1973, 29 U.S.C. §794(a) *et seq*. and the ACA.

<u>Claim for Relief</u>

10.  On January 13, 2022, Mr. Thompson, a mentally ill man with no known home, was arrested for trespassing at the Pentagon Mall.  Because he declined to give his name to his arresting officer or the magistrate before whom he appeared, he was incarcerated in the jail, a facility that receives federal financial support for its programs, including the provision of health care to inmates.  At the jail, Mr. Thompson, a pre-trial detainee, was booked under the name "John Doe."

11.   Apart from being manifestly mentally ill, Mr. Thompson was suffering from severe redness and swelling in his legs, later diagnosed as cellulitis.  But at all times during his incarceration in the ADC, he refused all forms of medical or mental health intervention. Throughout, he remained in the wheelchair provided to him by the jail.

12.   Concerned that Mr. Thompson's refusal of medical care could lead to life-threatening sepsis, on January 20, 2022, ADC health-care personnel transferred him to the Virginia Hospital Center's emergency department.

13.   Finding that Mr. Thompson's condition was sufficiently serious and that he lacked capacity to refuse necessary medical care due to psychosis, emergency department personnel immediately sought and obtained a temporary detention order ("TDO") on medical grounds, permitting involuntary evaluation and medication to treat the condition in his legs.

14.   Mr. Thompson was administered intravenous antibiotics by the emergency department staff, who found that he was suffering from cellulitis as well as from acute psychosis.  He was thereafter admitted as an inpatient to a hospital medical unit.

15.   According to the National Institutes of Health, "[c]ellulitis of the lower limb shares several clinical characteristics with deep vein thrombosis (DVT) and both have variability of clinical signs. These factors may lead to diagnostic uncertainty." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3606326/#.   The Centers for Disease Control explain that: "Deep vein thrombosis (DVT) is a condition in which a blood clot develops in the deep veins, usually in the lower extremities. A pulmonary embolism (PE) occurs when a part of the DVT clot breaks off and travels to the lungs, which can be life-threatening."

https://wwwnc.cdc.gov/travel/yellowbook/2024/air-land-sea/deep-vein-thrombosis-and-pulmonary-embolism.

16.  Mr. Thompson's symptoms were recognized as being so severe that the doctor who admitted him to the hospital's medical floor wrote on his plan: "DVT prophylaxis: Lovenox." Lovenox is a medication often given to address DVT and pulmonary embolisms in high-risk patients.

17.  The Clinical Practice Guidelines of the Infectious Disease Society of America provide, *inter alia,* as follows regarding the evaluation and treatment of cellulitis:

(¶4)  The recommended duration of antimicrobial therapy is 5 days, but treatment should be extended if the infection has not improved within this time period (strong, high).

(¶5)  Elevation of the affected area and treatment of predisposing factors, such as edema or underlying cutaneous disorders, are recommended (strong, moderate).

(¶6)  In lower-extremity cellulitis, clinicians should carefully examine the interdigital toe spaces because treating fissuring, scaling, or maceration may eradicate colonization with pathogens and reduce the incidence of recurrent infection (strong, moderate).

(¶7)  Outpatient therapy is recommended for patients who do not have S[ystemic] I[nflammatory] R[esponse] S[yndrome], altered mental status, or hemodynamic instability (mild nonpurulent; Figure 1) (strong, moderate). Hospitalization is recommended if there is concern for a deeper or necrotizing infection, for patients with poor adherence to therapy, for infection in a severely immunocompromised patient, or if outpatient treatment is failing (moderate or severe nonpurulent; Figure 1) (strong, moderate).

https://academic.oup.com/cid/article/59/2/e10/2895845 at §IV, ¶¶4-7.[6]

---

[6]The parenthetical references are, respectively, to (1) the strength of the recommendation and (2) the quality of supporting evidence.  *Id*. at Exec. Summary, Table I.

18.  On January 21, 2022, having seen Mr. Thompson, Dr. Prasad, a psychiatrist, made a consultation note including the following:

\*        P[atien]t brought in by police from Arlington county jail.  Per report the Pt. had worsening bilateral leg swelling since he has been in their custody.

\*        Patient is poorly interactive psychotic mute catatonic.

\*        Appeared to have a long history of schizophrenia.

19.  Dr. Prasad's mental status evaluation of Mr. Thompson states the following:

\*        Appearance: Well-developed, disheveled African-American male confused disorganized uncooperative catatonic poor self-care is with police escort as per the protocol at the jail.

\*        Behavior: Poorly interactive isolated.

\*        Speech: Poorly interactive mute.

\*        Mood: Depressed, sad, irritable, uncooperative.

\*        Affect: Disorganized thought process.

\*        Thought content: Appears to be responding to internal stimuli.

\*        Sensorium: Patient is alert uncooperative poor eye contact.

\*        Cognition:  impaired cognitive and memory functions.

\*        Insight: impaired.

20.  Dr. Prasad's diagnostic impression of Mr. Thompson was as follows (bracketed definitions of axes supplied by counsel):

* Axis I [Mental health and substance abuse disorders]: psychotic disorder secondary to general medical condition; rule out schizophrenia chronic 295.90; paranoid disorder, delusional disorder.

* Axis II [Intellectual development disorder]: deferred.

* Axis III [General medical conditions]: poor self-care, bilateral lower leg cellulitis.

* Axis IV [Psychosocial and environmental problems]: Moderate to severe.

* Axis V: [Global assessment of functioning ("GAF") on scale of 1-100]: 20-25.

21.  A GAF rating of 20-25 is consistent with the emergency medical staff's finding that Mr. Thompson lacked capacity to refuse necessary medical treatment and that a TDO was needed to ensure his proper medication.  Dr. Prasad diagnosed Mr. Thompson as having an undifferentiated type of schizophrenia.

22.  Consistent with the Clinical Practice Guidelines of the Infectious Disease Society of America for the treatment of cellulitis, *see* ¶17 *supra*, Dr. Yoon, Mr. Thompson's attending physician and the doctor who ultimately discharged him from the hospital, prescribed an initial five days of continuing medication in order to safeguard Mr. Thompson's health if not his life.[7]

23.  The day after Mr. Thompson's admission to the medical ward, Dr. Yoon consulted Dr. Prasad for input on mental health issues related to Mr. Thompson's status and treatment.  By that time, Dr. Prasad had made the assessment set forth above at ¶¶18-21, and Dr. Yoon was aware of it.  They both knew that Mr. Thompson: (a) was severely mentally ill, lacking  insight into the seriousness of his medical condition and the need to comply with his doctors'  treatment

---

[7]According to the referenced Guidelines, treatment should be extended if the infection has not improved within five days.  *See* ¶17, *supra.*

recommendations; (b) was known to have refused any and all medication voluntarily; (c) lacked capacity to refuse necessary medical care; (d) had received involuntary treatment for his medical condition the prior day due to the risks of serious harm caused by his refusal of care; (e) was at risk of DVT or pulmonary embolism given the infection in his lower legs and his decreased mobility; (f) would be discharged to a jail with uncertain if not unknown medical capacity; and (g) was virtually certain to continue refusing any and all medication if returned to the jail in his current condition, as jail staff expressly cautioned the hospital and as in fact occurred both at the jail and at the hospital.

24.  Notwithstanding his assessment of Mr. Thompson as set forth at ¶¶18-21 *supra*, Dr. Prasad advised Dr. Yoon that Mr. Thompson "did not meet criteria for inpatient psychiatric treatment."

25.  Given Dr. Prasad's assessment of Mr. Thompson set forth at ¶¶18-21 *supra*, his advice to Dr. Yoon that Mr. Thompson "did not meet criteria for inpatient psychiatric treatment" was unfathomable, baseless, and reckless.  It also reflected his cavalier indifference to the critical issue of whether Mr. Thompson required continued involuntary *medical* care because his mental illness incapacitated him from making rational decisions regarding the need to treat the condition in his lower legs, thereby placing him at increasingly substantial risk of serious harm. Dr. Prasad's advice to Dr. Yoon reflected his disregard of the known fact that the only way Mr. Thompson had been and could be treated for a potentially life-threatening medical condition was via court-ordered involuntary medication, premised on Mr. Thompson's known mental incapacity to make decisions about his health care.

26.  Like Drs. Prasad and Yoon, the hospital's nursing staff knew from Mr. Thompson's medical chart that he was refusing medication by reason of mental illness and that a court order had been obtained  providing for his involuntary medication.  Nevertheless, on numerous occasions following Mr. Thompson's admission to a medical unit, staff nurses charged to administer medication to Mr. Thompson repeatedly failed to do so simply because Mr. Thompson objected.  The nurses thus acted in knowing disregard of the existing court order and in gross derogation of their professional obligations as nurses. They noted Mr. Thompson's refusals in his medical chart.  The doctors under whose care Mr. Thompson fell, including Drs. Yoon and Prasad, were on notice of his refusals from the nurses' progress notes.

27.  Dr. Yoon was aware of Dr. Prasad's assessment of Mr. Thompson as a severely mentally ill patient.  She determined that Mr. Thompson required at least five days of ongoing antibiotics. She was aware of the likelihood of a poor outcome for Mr. Thompson were he not to receive the medication she prescribed.  She knew that he had refused to take medicine voluntarily, had received medication involuntarily pursuant to court order, could be counted on to continue refusing medication, and that ongoing involuntary – *i.e.* court-ordered – care was called for.

28.  Notwithstanding her awareness of Dr. Prasad's assessment and of Mr. Thompson's mental health symptoms, his condition, his history of refusing medication, and the need for him to continue his medications for at least five days, Dr. Yoon discharged him back to the jail even before the expiration of the 24-hour TDO secured the day before by emergency department staff.  On discharge, she provided him with a prescription for five days' worth of oral medication.

29.  Dr. Yoon's decision to discharge Mr. Thompson back to the jail with oral medication was unfathomable, baseless, and reckless. It reflected her disregard of the known fact that the only way Mr. Thompson could be treated for a potentially life-threatening medical condition was via court-ordered involuntary medication, premised on Mr. Thompson's mental incapacity to make decisions about his health care.

30.  As medical doctors, Drs. Yoon and Prasad could and should have insisted on an extension of court-ordered involuntary medication to safeguard their patient Mr. Thompson in an appropriate medical environment and thereby reduce the known risk of an adverse medical outcome for him.  This could have been accomplished by invoking the procedures available under any of several Virginia statutes providing for court-ordered involuntary treatment of at-risk patients.

31.  On information and belief, what drove Mr. Thompson's peremptory discharge to the jail whence he had come were (a) the substantial burdens and inconvenience of contending with a mentally ill patient whose psychiatric condition rendered him uncooperative and in need of forcible medication, and (b) the time-consuming burdens and inconvenience of attending to the monitoring, record-keeping and filings required to maintain Mr. Thompson involuntarily in the hospital under a new court order, or to transfer him to an appropriate secure facility for involuntary care.  Mr. Thompson's mental illness, in short, rendered him a disfavored medical patient who could not be discharged too soon from this general hospital.[8]

---

[8]Mr. Thompson's hospital bill was sent to Mediko, which under its governing contract was responsible for the health-care expenses of inmates committed to its care. It remains to be learned if Mediko was complicit in Mr. Thompson's premature discharge back to the jail.

32. On information and belief, at the time of Mr. Thompson's proposed discharge from the hospital, Drs. Yoon and Prasad had no knowledge or understanding of the medical facilities, procedures, staffing, and capacities of the jail where they knew Mr. Thompson would be held, including that facility's experience in securing medical TDOs. They knew only that the jail, deeming itself incapable of properly treating Mr. Thompson, had the day before sent him to the hospital's emergency room for treatment. Mr. Thompson was simply discharged from the hospital with five days of oral antibiotics that these defendants knew or should have known he would not take voluntarily, and without their having taken any steps to provide for his involuntary medication as Dr. Prasad himself recommended.

33. With the TDO procured by the emergency department still in effect, Mr. Thompson was discharged to the jail less than 24 hours after his admission. The discharge was authorized by Dr. Yoon following consultation with Dr. Prasad.

34. Dr. Yoon's decision and Dr. Prasad's agreement to have Mr. Thompson returned to the jail without securing an appropriate court order to continue his necessary and prescribed treatment, notwithstanding Mr. Thompson's manifest incapacity to refuse necessary medical treatment, were reckless, professionally substandard, in knowing disregard of Mr. Thompson's serious medical needs, and amounted to gross negligence.

35. Mr. Thompson's return to the jail placed on the jail defendants the onus of contending with the hospital's default in discharging Mr. Thompson prematurely. As of the time he returned to jail, Mr. Thompson (a) was known to be severely mentally ill, (b) was known to have required involuntarily medication the prior day in an attempt to secure his health; (c) was known to lack capacity to refuse necessary medical care, (d) was at risk of DVT or pulmonary embolism given

-14-

his condition and ongoing, wheelchair-bound, immobility, (e) was known to have refused any and all medication, (f) could reasonably be anticipated to continue refusing any and all medication, as was predicted by jail staff and as in fact occurred; and (g) had been prescribed five days' worth of oral antibiotics by his hospital doctor. In these circumstances, as soon as Mr. Thompson refused – as he did immediately – to take the medication prescribed by Dr. Yoon, the jail defendants should have returned him to the hospital's emergency room or otherwise secured an appropriate order for the involuntary administration of the medication he required.

36.   Following his return to the jail,  Mr. Thompson resumed his prior refusal of all medical and mental health care.  He remained lethargic and wheelchair-bound, spending virtually 24 hours/day in his wheelchair.  With each passing day he became increasingly at risk of DVT and pulmonary embolism, even without regard to his cellulitis.  He did not take the antibiotics provided by the hospital.  The jail defendants did not prescribe any precautions or treatment to address the risk of DVT, did not cause his legs to be elevated, and did not examine his inter-digital toe spaces, all being necessary and appropriate for a patient with cellulitis.

37.   At all relevant times, including but not limited to the period January 20, 2022-February 1, 2022, Mr. Thompson was incapacitated within the meaning of CODE OF VA. §8.01-229(A)(2)(b), nor was a conservator, guardian or committee appointed for him.  Dr. Ijeh, a psychiatrist at the jail, noted that Mr. Thompson could not be assessed mentally.  At Virginia Hospital Center on January 21, 2022, Dr. Prasad, noting that Mr. Thompson apparently had a "long history of schizophrenia," characterized him with the following descriptors (*see* ¶¶18-20 *supra)*: confused, disorganized, uncooperative, catatonic, poorly interactive isolated, poorly interactive mute, depressed, sad, irritable, having disorganized thought process, apparently

-15-

responding to internal stimuli, having impaired cognitive and memory functions and insight, suffering from psychotic disorder, paranoid disorder, and delusional disorder, and with a global assessment of 20-25 out of 100.  Mr. Thompson's uncooperative and catatonic demeanor and behavior did not change following his peremptory discharge from the hospital back to the jail, where he died eleven days later.[9]

38.  Each of the jail defendants[10] had renewed personal or direct supervisory dealings with or regarding Mr. Thompson following his return to the jail on January 21, 2022.[11]  Each was or should have been aware of the above-referenced professional guidelines noted at ¶¶15 and 17, *supra.*  Each knew that Mr. Thompson suffered from a mental illness causing a lack of insight and noncompliance with medical recommendations, that the inflamation and associated pain in Mr. Thompson's legs decreased his mobility and led to his remaining seated in his wheelchair with legs in a passive position, that he refused to elevate his legs, that he had required emergency admission to the hospital, that judicial authority had been solicited and received for him to receive involuntary medication for a potentially life-threatening condition, that he was continuing to manifest incapacity to make critical decisions about his health, and that he was at risk for DVT and acute pulmonary embolism, possibly to the point of death.

----

[9]This summary of Mr. Thompson's mental history and condition serves to demonstrate that from – at very least – January 20 through February 1, 2022 he was mentally incapacitated within the meaning of Code of Va. §8.01-229(2)(b), as a result of which the two-year statutory period of limitations governing the  malpractice claims against Drs. Yoon and Prasad (Counts III and IV) was tolled for at least those few days.  The tolling rendered the antecedent lawsuit *Thompson v. Ayyas* filed in circuit court timely under Code of Va. §8.01-299(E)(3), and the instant lawsuit as well.

[10]*See* n. 5 at 5, *supra.*

[11]*See* n. 3 at 4, *supra.*

39.   While cognizant of Mr. Thompson's condition and the risks he was facing when not medicated, as set forth above, none of the jail defendants responded to Mr. Thompson's lethargic and untreated state until the day he died, other than by noting his refusal of treatment in Mr. Thompson's medical chart.  He was not returned to the hospital. No TDO was sought or secured to permit him to be appropriately medicated.  These failures continued for eleven days following Mr. Thompson's return to the jail.

40.   On February 1, 2022, the eleventh day following Mr. Thompson's return to the jail, several of the jail defendants, including but not limited to defendants Ijeh, Ekwe, Nunez, Cassidy, Ayales, and Graham, recognized a need to return him to the hospital on an emergency basis and secure another TDO.  Mediko Chief Operating Officer Cassidy said: "We need to get him out of here.  He  needs to go back to the hospital." This meeting, which began at 11:30 AM, ended at 1:30 PM.

41.   Lacking appropriate training and supervision, neither Mediko or CSB staff knew who should apply for a new TDO, or how to do so, or what their several  options were for securing an involuntary placement of Mr. Thompson in light of his refusal of necessary medication due to his mental illness.  So Mediko staff, including  defendants Ijeh, Ekwe, Nunez, Cassidy, and Ayales, went to lunch.

42.   Dr. Ayales asked Ms. Graham to find and fill out the forms for him to sign to secure the proposed medical TDO.  She "located the needed documents and filled them out to the best of [her] ability."  Defendant Graham could not fill out the complete form because a doctor must make certain entries on the form she used and she was not a doctor.  Because she was not

properly trained or supervised, she did not know which person or entity would be the proper petitioner for the medical TDO for which she undertook to prepare a petition.

43. Defendant Graham did not send her draft of TDO materials to Dr. Ayales. Rather, she sent this material to Mediko COO Cassidy. Sometime before 1:30 PM, she saw Mr. Cassidy and told him that the documents had been sent to him and that he "needed to move forward from that point."

44. Mr. Cassidy is a business executive, not a doctor or lawyer. On information and belief he did not know how to do what had to be done. By reason of the above-referenced failure of training and supervision, the petition was never completed or filed. Mr. Thompson was never taken to the hospital. Just before 3 PM the same day, Mr. Thompson was found dead in his cell. According to the report of his autopsy, his death was caused by an acute pulmonary embolism.

45. The jail defendants' failure, from January 21 to February 1, 2022, to respond professionally and adequately to Mr. Thompson's known lethargic, untreated, and stationary state, other than by noting his refusal of treatment in his medical chart, as set forth above, was objectively unreasonable, reckless, professionally substandard, in knowing disregard of Mr. Thompson's serious medical needs and his rights under settled law, grossly negligent, and exemplified knowing indifference to the risks posed by his untreated medical condition.

46. At issue here was not an isolated act of negligence by one nurse of doctor. Rather, at issue was the wholesale failure of more than a dozen of the jail's individual health care providers, whether doctors or nurses, to take necessary, obvious, and readily accomplished steps over an eleven day period in order to secure the health and well-being of a patient they knew to be seriously at risk. This wholesale failure exemplifies the failure of defendants Mediko and CSB

-18-

properly to (a) train and (b) supervise their employees in the provision of health care to mentally ill and uncooperative jail inmates lacking capacity to make critical medical decisions, as set forth above.  As a direct result of these objectively unreasonable and deliberately indifferent failures to provide proper training and supervision, Mr. Thompson was denied the care he required, leading to his suffering and death.

## Causes of Action

### Count I: Jail Defendants

### Unconstitutionally Substandard Care: 14th Amendment Violation

47.     By knowingly suffering Mr. Thompson to suffer, waste away, and die on their watch without taking steps to treat him or get him the treatment he manifestly required, while aware of the risks posed by his untreated medical condition, as set forth above, the jail defendants – all health care providers of one sort or another – provided Mr. Thompson with objectively unreasonable care, leading to his suffering and death.  The claim for Mr. Thompson's resulting damages under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983 survives Mr. Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by plaintiffs, the personal representatives of Mr. Thompson's estate.  If and to the extent the Court sees fit to assess any qualified immunity defense mounted by any jail defendant under an Eighth Amendment standard, plaintiffs claim that these defendants' actions manifested their deliberate indifference to Mr. Thompson's known serious medical needs and his rights under settled law.

### Count II: Jail Defendants

### Negligence / Gross Negligence / Medical Malpractice

48.  By knowingly suffering Mr. Thompson to suffer, waste away, and die on their watch

without taking steps to treat him or get him the treatment he manifestly required, as set forth

above, the jail defendants – all health care providers of one sort or another – failed to provide

Mr. Thompson with the skill and diligence of reasonably prudent Virginia practitioners in their

respective fields of practice, including specifically medicine, psychiatry, nursing, and the

administration of medical care.  They each thereby fell below the standard of care required under

Virginia law, demonstrated negligence, gross negligence, and materially contributed to

Mr. Thompson's suffering and death.  The claim for Mr. Thompson's resulting damages survives

Mr. Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by plaintiffs,

the personal representatives of Mr. Thompson's estate.

### Count III: Defendants Prasad and Yoon

### Medical Malpractice

49.   As set forth above, Dr. Prasad and Dr. Yoon knew, from hospital nurses' progress

notes, that on numerous occasions nurses charged to administer court-approved involuntary

medication failed to do so because Mr. Thompson objected.  Drs. Prasad and Yoon also knew that

Mr. Thompson: was severely mentally ill, lacking  insight into the seriousness of his medical

condition and the need to comply with his doctors' treatment recommendations; lacked capacity to

refuse necessary medical care; was the subject of a court order for involuntary treatment of his

medical condition; was at risk of DVT or pulmonary embolism given the infection in his lower

legs and his decreased mobility; and required additional court-ordered involuntary medication for at least five days by reason of his ongoing mental incapacity to make decisions about his health care.   Nevertheless, Dr. Prasad incomprehensibly took no steps in pursuit of the additional involuntary court-ordered care he recommended, and Dr. Yoon incomprehensibly discharged Mr. Thompson, with his hospital TDO still in force, fewer than 24 hours after his hospital admission, back to the jail whence he had come, with oral medication he would not take, as jail staff expressly cautioned the hospital and as in fact occurred both at the jail and at the hospital.  The peremptory discharge of Mr. Thompson back to the jail, with no new court order for involuntary medication having been sought or obtained, constituted a default on the part of Drs. Prasad and Yoon in securing care needed to protect against a potentially severe adverse result for Mr. Thompson, as in fact occurred. The discharge, *sans* provision for ongoing involuntary treatment, was unfathomable, baseless, reckless, professionally substandard, negligent, grossly negligent, and amounted to medical malpractice.  The claim for Mr. Thompson's resulting damages survives Mr. Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by plaintiffs, the personal representatives of Mr. Thompson's estate.

### Count IV: All Defendants Except Defendants Hospital, VHC LLC, & C.M. Prasad M.D.P.C.

### Wrongful Death

50.    By their actions and inactions set forth above, all defendants except defendants Hospital, VHC LLC, & C.M. Prasad M.D.P.C., provided Mr. Thompson with substandard health care and committed gross negligence and malpractice, leading to his death.  Pursuant to Code of

Va. §8.01-50 *et seq.*, they are liable for Mr. Thompson's wrongful death to his statutory

beneficiaries: his parents Louis and Joyce Thompson and his brother Carlton Thompson.

<u>Count V: Mediko, Inc.</u>

<u>Unconstitutional Failure to Train: 14th Amendment Violation</u>

51. The ongoing defaults, for days on end, of the numerous jail defendants

who were Mediko employees[12], as set forth above, exemplifies the failure on the part of their

employer defendant Mediko properly to train them in their provision of constitutionally mandated

health care to uncooperative, mentally ill patients. As a direct result of this failure of proper

training, the Mediko jail defendants provided Mr. Thompson with objectively unreasonable care,

while aware of the risks posed by his untreated medical condition, leading to his suffering and

death. The resulting claim against Mediko for Mr. Thompson's resulting damages under the

Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983 survives Mr.

Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by plaintiffs,

personal representatives of Mr. Thompson's estate. If and to the extent the Court sees fit to

assess any qualified immunity defense mounted by Mediko under an Eighth Amendment standard,

plaintiffs claim that Mediko's actions manifested its deliberate indifference to Mr. Thompson's

known serious medical needs and his rights under settled law.

---

[12]*See* n. 3 at 4, *supra.* Which individual defendants were employees of Mediko and which
of CSB will be clarified as promptly as possible.

<u>Count VI: Mediko, Inc.</u>

<u>Unconstitutional Failure to Supervise: 14th Amendment Violation</u>

52.  The ongoing defaults, for days on end, of the numerous jail defendants

who were Mediko employees[13], as set forth above, demonstrate the failure on the part of their

employer defendant Mediko properly to supervise them in their provision of constitutionally

mandated health care to uncooperative mentally ill patients.  As a direct result of this failure of

proper supervision, Mediko provided Mr. Thompson with objectively unreasonable care, leading

to his suffering and death.  The resulting claim against Mediko for Mr. Thompson's resulting

damages under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983

survives Mr. Thompson's death pursuant to CODE OF VA. §8.01-25 and is properly presented by

plaintiffs, personal representatives of Mr. Thompson's estate.  If and to the extent the Court sees

fit to assess any qualified immunity defense mounted by Mediko under an Eighth Amendment

standard, plaintiffs claim that Mediko's actions manifested its deliberate indifference to

Mr. Thompson's known serious medical needs and his rights under settled law.


<u>Count VII: Mediko & CSB</u>

<u>*Respondeat Superior*</u>

53.  Defendants Mediko and CSB are liable under the doctrine of *respondeat superior* for

the consequences of the state law torts of their respective employees set forth in this complaint.

---

[13]*See* n. 3 at 4, *supra.*

<u>Count VIII: CSB</u>

<u>Unconstitutional Failure to Train: 14th Amendment Violation</u>

54.  The ongoing defaults of  all the jail defendants who were CBS employees[14] for days on end, as set forth above, demonstrate the failure on the part of their employer defendant CSB properly to train them in their provision of constitutionally mandated health care to uncooperative, mentally ill, incarcerated patients.  As a direct result of this failure of proper training, the jail defendants provided Mr. Thompson with objectively unreasonable care, leading to his suffering and death.  The resulting claim against CSB for Mr. Thompson's resulting damages under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983 survives Mr. Thompson's death pursuant to CODE OF VA. §8.01-25 and is properly presented by plaintiffs, personal representatives of Mr. Thompson's estate.  If and to the extent the Court sees fit to assess any qualified immunity defense mounted by CSB under an Eighth Amendment standard, plaintiffs claim that CSB's actions manifested its deliberate indifference to Mr. Thompson's known serious medical needs and his rights under settled law.

<u>Count IX: CSB</u>

<u>Unconstitutional Failure to Supervise: 14th Amendment Violation</u>

55.  The ongoing defaults of all the jail defendants who were CSB employees[15] for days on end, as set forth above, exemplifies the failure on the part of their employer defendant CSB properly to supervise them in their provision of constitutionally mandated health care to

---

[14] *See* n. 3 at 4, *supra.*

[15] *See* n. 3 at 4, *supra.*

uncooperative, mentally ill, incarcerated patients.  As a direct result of this failure of proper

supervision, the jail defendants provided Mr. Thompson with objectively unreasonable care,

leading to his suffering and death.  The resulting claim against CSB for Mr. Thompson's resulting

damages under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983

survives Mr. Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by

plaintiffs, personal representatives of Mr. Thompson's estate.  If and to the extent the Court sees

fit to assess any qualified immunity defense mounted by CSB under an Eighth Amendment

standard, plaintiffs claim that CSB's actions manifested its deliberate indifference to

Mr. Thompson's known serious medical needs and his rights under settled law.


## Count X: Defendant Mediko

### Affordable Care Act: Mental Health Disability Discrimination

56.  Mr. Thompson's severe mental illness constituted a disability under the Rehabilitation

Act of 1973, 29 U.S.C. §794(a) *et seq*. and the Affordable Care Act, 42 U.S.C. §1811 *et seq*.

("ACA").  Defendant Mediko acted as an agent of the state in attending, as required, to the

physical health of inmates incarcerated in the jail, a facility receiving financial assistance under

programs funded by the federal government and governed by the Rehabilitation Act and the ACA.

This role imposed on Mediko the obligation to take appropriate steps, including securing judicial

intervention if needed, to safeguard an inmate lacking mental capacity to make a decision to

refuse necessary medical care for a serious medical condition.  At all relevant times,

Mr. Thompson suffered and was known to suffer from severe and potentially life-threatening

*medical* conditions that finally led to his death in the ADC.  As Mediko staff knew first-hand, he

-25-

was also severely *mentally* ill, with symptoms rendering him uncooperative, catatonic, and consistently unwilling to accept the medical care he required.   Because of his mental illness, causing him to refuse necessary medical care, and for no other reason, following Mr. Thompson's return to the ADC on January 21, 2022, Mediko washed its hands of Mr. Thompson's dire *physical* condition, abandoning its professional, contractual, legal, and moral obligations to him as a patient with serious but treatable medical needs, and knowingly and callously suffered him to live out his remaining days unmedicated for his physical problems and in pain, until he died.   By their actions and inactions set forth above, Mediko thereby discrim-inated against Mr. Thompson, a *mentally* disabled person, by causing him to be denied available and necessary *medical* treatment for his physical well-being, thereby leading to his ongoing suffering and ultimately his death.   The claim for his damages resulting from this discrimination arises under the Affordable Care Act, incorporating the enforcement mechanisms of the Rehabilitation Act.   The claim survives Mr. Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by plaintiffs, the personal representatives of Mr. Thompson's estate.

## Count XI: Defendant Virginia Hospital Center Arlington Health System

### Violation of Affordable Care Act

57.  Mr. Thompson's severe mental illness constituted a disability under the Rehabilitation Act of 1973, 29 U.S.C. §794(a) *et seq*. and the Affordable Care Act, 42 U.S.C. §1811 *et seq*. ("ACA").   Defendant Virginia Hospital Center Arlington Health System was at all times a facility receiving financial assistance under programs funded by the federal government and governed by the Rehabilitation Act and the ACA.   This role imposed on the hospital the obligation to take

appropriate steps, including enforcing judicial orders safeguarding a patient lacking capacity to make a decision to refuse necessary medical care and obtaining additional such orders if necessary.  At all relevant times, Mr. Thompson suffered and was known to suffer from severe and potentially life-threatening *medical* conditions that finally led to his death.  He was also known to be severely *mentally* ill, manifesting symptoms and behaviors to refuse the medical care he required.   Because of his mental illness causing him so to refuse, and despite the pendency of a court order authorizing involuntary medical care, starting from his discharge from the emergency department to a medical ward on January 20, 2021, the hospital, through its doctors and nurses, washed its hands of Mr. Thompson's dire *physical* condition, abandoning all professional, legal, and moral obligations to him as a patient with serious but treatable medical needs. Rather, it knowingly and callously (a) ignored the non-administration of medication that Mr. Thompson required according to hospital doctors' orders, (b) took no steps to secure the ongoing involuntary medication of Mr. Thompson known to be required for his physical health, and (c) caused Mr. Thompson to be prematurely dumped as a patient to a jail where it knew he had not been, and could and would not be, properly treated.  By its actions and inactions set forth above, the hospital thereby discriminated against Mr. Thompson, a *mentally* disabled person, by causing him to be denied available and necessary *medical* treatment for his physical well-being, thereby leading to his ongoing suffering and ultimately his death.  The claim for his damages resulting from this discrimination arises under the Affordable Care Act, incorporating the enforcement mechanisms of the Rehabilitation Act. This claim survives Mr. Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by plaintiffs, the personal representatives of Mr. Thompson's estate.

Count XII: Defendants Yoon and Virginia Hospital Center Physician Group LLC

Violation of Affordable Care Act

58.  Mr. Thompson's severe mental illness constituted a disability under the Rehabilitation

Act of 1973, 29 U.S.C. §794(a) et seq. and the Affordable Care Act, 42 U.S.C. §1811 et seq.

("ACA").  Defendants Yoon and Virginia Hospital Center Physician Group LLC at all times

received financial assistance under programs funded by the federal government and governed by

the Rehabilitation Act and the ACA.  This role imposed on them the obligation to take appropriate

steps, including enforcing judicial orders safeguarding a patient lacking capacity to make a

decision to refuse necessary medical care, and obtaining additional such orders if necessary.  At

all relevant times, Mr. Thompson suffered and was known to suffer from severe and potentially

life-threatening *medical* conditions that finally led to his death.  He was also known to be severely

*mentally* ill, manifesting symptoms and behaviors to refuse the medical care he required.

Because of his mental illness, causing him so to refuse, and despite the pendency of a court order

authorizing involuntary medical care, starting from his discharge from the emergency department

to a medical ward on January 20, 2021, defendants Yoon and VHC LLC, washed their hands of

Mr. Thompson's dire physical condition, abandoning all professional, legal, and moral obligations

to him as a patient with serious but treatable medical needs.  Rather, they knowingly and callously

(a) ignored the non-administration of medication that Mr. Thompson required according to

hospital doctors' orders; (b) took no steps to secure the ongoing involuntary medication of Mr.

Thompson known to be required for his physical health, and (c) caused Mr. Thompson to be

prematurely dumped as a patient to a jail where they knew he had not been, and could and would

not be, properly treated. By their actions and inactions set forth above, defendants Yoon and

-28-

VHCLLC discriminated against Mr. Thompson, a mentally disabled person, by causing him to be denied available and necessary medical treatment for his physical well-being, thereby leading to his ongoing suffering and ultimately his death.  The claim for his damages resulting from this discrimination arises under the Affordable Care Act, incorporating the enforcement mechanisms of the Rehabilitation Act.  This claim survives Mr. Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by plaintiffs, the personal representatives of Mr. Thompson's estate.

<u>Count XIII: Defendants C. M. Prasad and C. M. Prasad M.D. P.C.</u>

<u>Violation of Affordable Care Act</u>

59.  Mr. Thompson's severe mental illness constituted a disability under the Rehabilitation Act of 1973, 29 U.S.C. §794(a) et seq. and the Affordable Care Act, 42 U.S.C. §1811 et seq. ("ACA").  Defendants C.M. Prasad and C. M. Prasad M. D. P. C. ("Prasad P.C.") at all times received financial assistance under programs funded by the federal government and governed by the Rehabilitation Act and the ACA.  This role imposed on defendants Dr. Prasad and Prasad P.C. the obligation to take appropriate steps, including seeking judicial orders safeguarding a patient lacking capacity to make a decision to refuse necessary medical care, and obtaining and enforcing additional such orders as necessary.  At all relevant times, Mr. Thompson suffered and was known to suffer from severe and potentially life-threatening medical conditions that finally led to his death.  He was also known to be severely mentally ill, manifesting symptoms and behaviors to refuse the medical care he required.  Because of his mental illness, causing him so to refuse, and despite the pendency of a court order authorizing involuntary medical care, starting from his

discharge from the emergency department to a medical ward on January 20, 2021, Drs. Prasad and Prasad P.C. washed their hands of Mr. Thompson's dire physical condition, abandoning all professional, legal, and moral obligations to him as a patient with serious but treatable medical needs. Rather, they knowingly and callously (a) ignored the non-administration of medication that Mr. Thompson required according to hospital doctors' orders, (b) took no steps to secure the ongoing involuntary medication of Mr. Thompson known to be required for his physical health, and (c) knowingly acquiesced in Mr. Thompson's being prematurely dumped as a patient to a jail where they knew he had not been, and could and would not be, properly treated.  By their actions and inactions set forth above, defendants Prasad and Prasad P.C. discriminated against Mr. Thompson, a mentally disabled person, by causing him to be denied available and necessary medical treatment for his physical well-being, thereby leading to his ongoing suffering and ultimately his death.  The claim for his damages resulting from this discrimination arises under the Affordable Care Act, incorporating the enforcement mechanisms of the Rehabilitation Act.  This claim survives Mr. Thompson's death pursuant to Code of Va. §8.01-25 and is properly presented by plaintiffs, the personal representatives of Mr. Thompson's estate.

*

Wherefore, Ms. Thompson asks this Court for an order:

*    Granting her actual damages and punitive damages appropriate to the proof at trial against the defendants, jointly and severally, for Mr. Thompson's pain and suffering in the jail in the period January 21 - February 1, 2022, including hedonic damages for the loss of life and enjoyment of life, jointly and severally against all defendants; provided that punitive damages are not sought against the CSB.

\*  Awarding actual and punitive damages appropriate to the proof at trial against the defendants, jointly and severally, for the wrongful death of Paul Thompson, to his surviving kin Joyce, Lewis and Carlton Thompson, in accordance with the provisions of Code of Va. §8.01-52, jointly and severally against all defendants; provided that punitive damages are not sought against the CSB.

\*  Awarding plaintiff's costs and reasonable attorney's fees; and

\*  Granting such other relief as is just.

The Thompsons request trial by jury.

        Respectfully submitted,

        JOYCE AND LOUIS THOMPSON,

        By counsel

Dated:  October 1, 2024

Counsel for Plaintiffs:

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com

ThompsonPaul\Pleadings\2024-1001Complaint

-31-