IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JOYCE and LOUIS THOMPSON, *as*     )
*Personal Representatives of the Estate of*     )
*Paul Thompson,*     )
                        )
      Plaintiffs,             )
                        )
      v.                     )       Civil Action No. 1:24-cv-1736 (RDA/WBP)
                        )
MEDIKO, INC., *et al.,*       )
                        )
      Defendants.           )
                        )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants Virginia Hospital Center ("VHC") Physician Group, Virginia Hospital Center, Arlington Health System, and Jeanie Yoon's Motion to Dismiss (Dkt. 19), the Mediko Defendants' Motion to Dismiss (Dkt. 23),[1] Defendants Dr. C. M. Prasad and C.M. Prasad, M.D., P.C.'s Motion to Dismiss (Dkt. 36), the Individual Mediko Defendants' Motion to Dismiss (Dkt. 44),[2] and Defendant Abu Smith's Motion to Dismiss (Dkt. 49). This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. For the reasons that follow and considering the Motions together with Plaintiffs' Complaint (Dkt. 3), Defendants' Memoranda in Support (Dkts. 20, 24, 36-1, 45, 50), Plaintiffs' Opposition Briefs (Dkts. 56-58), and Defendants' Reply Briefs (Dkt. 60, 61, 63), the Court: (i) GRANTS-IN-PART and DENIES-IN-PART Defendants VHC Physician Group, VHC

---

[1] The Mediko Defendants include Mediko, Inc. ("Mediko"), Dr. Shadi Ayyas, LPN Mohammed Azam, Mark Cassidy, NP Akame Ekwe, Dr. David Ijeh, Donna McKay, Dr. Juan Nunez, and RN Samantha Slydell. Dkt. 23 at 1.

[2] The Individual Mediko Defendants include NP Carol Chike, LPN Shenita Cooper-White, RN Michael Derara, RN Javier Garcia-Ruiz, Robyn Maas, QMHP Dawn Treese-Scott, and RN Cynthia Taferi. Dkt. 44 at 1.

AHS, and Dr. Jeanie Yoon's Motion; (ii) GRANTS-IN-PART and DENIES-IN-PART the Mediko Defendants' Motion; (iii) GRANTS Defendants C.M. Prasad and Prasad P.C.'s Motion; (iv) GRANTS the Individual Mediko Defendants' Motion; and (v) GRANTS Defendant Abu Smith's Motion.

## I.  BACKGROUND

### A.  Factual Background[3]

Plaintiffs Joyce and Louis Thompson ("Plaintiffs") bring this suit on behalf of Paul Thompson ("Thompson"), who was arrested and detained at the Arlington, Virginia Adult Detention Center ("ADC") from January 13, 2022, to February 1, 2022.  Dkt. 3 ¶¶ 10, 45. Thompson is now deceased, and Plaintiffs are the duly appointed personal representatives of the Estate.  *Id.* ¶ 2.

On January 13, 2022, Thompson was arrested and subsequently detained pre-trial at ADC. *Id.* ¶ 10.  Thompson declined to give his name to his arresting officer or the magistrate before whom he appeared, so at ADC, Thompson was booked under the name "John Doe."  *Id.*  Plaintiffs allege that "[a]part from being manifestly mentally ill," at the time of his arrest, Thompson was suffering from severe redness and swelling in his legs, later diagnosed as cellulitis.  *Id.* ¶ 11.

On January 20, 2022, ADC healthcare personnel transferred Thompson to the Virginia Hospital Center ("VHC") emergency department out of concern that Thompson's refusal of medical care could lead to life-threatening sepsis.  *Id.* ¶ 12.  Finding that Thompson's condition was sufficiently serious and that he lacked capacity to refuse necessary medical care due to psychosis, VHC emergency department personnel immediately sought and obtained a temporary

---

[3] For purposes of considering the instant Motions to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

detention order ("TDO") on medical grounds, which permitted involuntary evaluation and medication to treat Thompson's legs. *Id.* ¶ 13. Thompson was then administered intravenous antibiotics by the VHC emergency department staff, who found that Thompson was suffering from cellulitis in addition to acute psychosis. *Id.* ¶ 14. Thompson was thereafter admitted into inpatient hospital care. *Id.* The physician who admitted Thompson to the hospital's inpatient medical floor noted "DVT prophylaxis: Lovenox." *Id.* ¶ 16.[4]

On January 21, 2022, Dr. C.M. Prasad ("Dr. Prasad") conducted a visit with Thompson in the hospital and made a consultation note that stated the following:

> P[atien]t brought in by police from Arlington county jail. Per report Pt. had worsening bilateral leg swelling since he has been in their custody. Patient is poorly interactive psychotic mute catatonic. Appeared to have a long history of schizophrenia. Appearance: [w]ell-developed, disheveled African-American male confused disorganized uncooperative catatonic poor self-care is with police escort as per the protocol at the jail. Behavior: [p]oorly interactive isolated. Speech: [p]oorly interactive mute. Mood: [D]epressed, sad, irritable, uncooperative. Affect: [d]isorganized thought process. Thought content: [A]ppears to be responding to internal stimuli. Sensorium: [p]atient is alert uncooperative poor eye contact. Cognition: impaired cognitive and memory functions. Insight: impaired.

*Id.* ¶¶ 18-19. Dr. Prasad gave Thompson a global assessment of functioning ("GAF") rating of 20-25 on a scale of 1-100. *Id.* ¶ 20. Dr. Prasad also diagnosed Thompson as having an undifferentiated type of schizophrenia. *Id.* ¶ 21. Dr. Prasad further noted that Thompson apparently had a "long history of schizophrenia" and that he appeared "confused, disorganized, uncooperative, catatonic, poorly interactive isolated, poorly interactive mute, depressed, sad, [and] irritable." *Id.* ¶ 37.

Dr. Yoon, Thompson's attending physician in the hospital, prescribed an initial five days of continuing medication as treatment for his cellulitis. *Id.* ¶ 22. The day after Thompson's

---

[4] The Court notes that DVT likely refers to the condition deep vein thrombosis ("DVT"), which is where a blood clot develops in the deep veins, usually in the lower extremities. Lovenox is a medication given to address DVT and pulmonary embolisms in high-risk patients. *Id.* ¶¶ 15-16.

admission to the inpatient ward of the hospital, Dr. Yoon consulted with Dr. Prasad (after he had assessed Thompson) for input on his mental health issues. Plaintiffs allege that, at this point, both Dr. Prasad and Dr. Yoon knew that Thompson

> (a) was severely mentally ill, lacking insight into the seriousness of his medical condition and the need to comply with his doctors' treatment recommendations; (b) was known to have refused any and all medication voluntarily; (c) lacked capacity to refuse necessary medical care; (d) had received involuntary treatment for his medical condition the prior day due to the risks of serious harm caused by his refusal of care; (e) was at risk of DVT or pulmonary embolism given the infection in his lower legs and his decreased mobility; (f) would be discharged to a jail with uncertain if not unknown medical capacity; and (g) was virtually certain to continue refusing any and all medication if returned to the jail in his current condition, as jail staff expressly cautioned the hospital and as in fact occurred both at the jail and at the hospital.

*Id.* ¶ 23. Despite his assessment of Thompson, Dr. Prasad advised Dr. Yoon that Thompson "did not meet criteria for inpatient psychiatric treatment." *Id.* ¶ 24. Plaintiffs allege that Dr. Prasad's determination that Thompson did not meet the criteria for inpatient psychiatric treatment was baseless and reckless and reflected his disregard for Thompson's condition. *Id.* ¶ 25.

Plaintiffs further allege that the hospital's nursing staff knew from Thompson's medical chart that he was refusing medication because of his mental illness and that a court order had been obtained to provide him involuntary medication. *Id.* ¶ 26. Yet, Plaintiffs allege that, on numerous occasions, staff nurses failed to administer medication because Thompson objected. *Id.* The nurses noted Thompson's refusals in his medical chart and Dr. Yoon and Dr. Prasad were on notice of his refusals from the nurses' progress notes. *Id.*

Despite Thompson's refusal of medications and the nursing staff's failure to administer the prescribed medication, Dr. Yoon discharged Thompson back to the jail before the expiration of the 24-hour TDO. *Id.* ¶ 28. Upon discharge, Dr. Yoon provided Thompson with a prescription of five days' worth of oral medication. *Id.* Plaintiffs allege that Dr. Yoon's decision to discharge

Thompson back to the jail was baseless and reckless and reflected her disregard for the fact that Thompson's condition could only be treated through court-ordered involuntary medication. *Id.* ¶ 29. Upon information and belief, Plaintiffs allege that Thompson's discharge was based on "(a) the substantial burdens and inconvenience of contending with a mentally ill patient whose psychiatric condition rendered him uncooperative and in need of forcible medication, and (b) the time consuming burdens and inconvenience of attending to the monitoring, record-keeping and filings required to maintain []Thompson involuntarily in the hospital under a new court order, or to transfer him to an appropriate secure facility for involuntary care." *Id.* ¶ 31. Plaintiffs allege that Thompson's mental illness rendered him a "disfavored medical patient" which led to his speedy and untimely discharge from the hospital. *Id.*

Thompson's discharge was authorized by Dr. Yoon following her consultation with Dr. Prasad. *Id.* ¶ 33. Following his return to the jail, Thompson resumed his prior refusal of all medical and mental health care. *Id.* ¶ 36. Thompson remained lethargic, wheelchair-bound, and spent nearly 24 hours per day in his wheelchair. *Id.* Thompson did not take the antibiotics provided by the hospital. *Id.* Thompson's uncooperative and catatonic demeanor and behavior did not change following his discharge from the hospital back to the jail. *Id.* ¶ 37. Dr. Ijeh, a psychiatrist at the jail, noted that Thompson could not be assessed mentally. *Id.*

Plaintiffs allege that each of the "Jail Defendants"[5] had renewed personal or direct supervisory dealings with or regarding Thompson following his return to the jail on January 21, 2022. *Id.* ¶ 38. Plaintiffs allege that each of them was or should have been aware of various professional guidelines regarding treatment and consequences of cellulitis and DVT. *Id.* Plaintiffs

---

[5] Plaintiffs allege that Shadi Ayyas, Dr. Ayales, Mohammed Azam, Tatiana Campbell (dismissed defendant), Mark Cassidy, Chike, Shenita Cooper, Michael Derara, Akame Ekwe, Beverly Franks, Javier Garcia-Ruiz, Aubrey Graham (dismissed defendant), Dr. Ijeh, Robyn Maas, Donna McKay, Dr. Nunez, Abu Smith, Dawn Treese-Scott, Samantha Slydell, and Cynthia Taferi are the "Jail Defendants."

allege that each knew that Thompson suffered from a mental illness that caused noncompliance with medical recommendations, that Thompson had required emergency admission to the hospital, and that he was at risk for DVT and acute pulmonary embolism. *Id.* Plaintiffs allege that none of the Jail Defendants responded to Thompson's lethargic and untreated state until the day he died, other than by noting his refusal of treatment in Thompson's medical chart. *Id.* ¶ 39.

On February 1, 2022, eleven days after Thompson's return to the jail from the hospital, a subset of the Jail Defendants, specifically Dr. Ijeh, Ekwe, Dr. Nunez, Cassidy, Dr. Ayales, and Graham (not including Graham, the "Meeting Participant Defendants"), participated in a meeting where Thompson's medical condition was discussed. *Id.* ¶ 40. In the meeting, Cassidy said: "We need to get [Thompson] out of here. He needs to go back to the hospital." *Id.*

Plaintiffs allege that due to the lack of appropriate training and supervision, none of the Meeting Participant Defendants knew who should apply for a new TDO or how to do so. *Id.* ¶ 41. Despite discussing the urgency of the situation during the meeting, after the meeting, the Meeting Participant Defendants went to lunch. *Id.* After returning from lunch, Dr. Ayales asked Graham to find and fill out the necessary forms for him to sign to secure the proposed medical TDO for Thompson. *Id.* ¶ 42. Graham "located the documents and filled them out to the best of her ability." *Id.* (internal brackets omitted). Graham, however, could not complete the form because a doctor was required to make certain entries on the form and she was not a doctor. *Id.* Plaintiffs allege that because Graham was not properly trained or supervised, she did not know which person or entity would be the proper petitioner for the medical TDO. *Id.*

After preparing (an incomplete) TDO, Graham sent the materials to Cassidy. *Id.* ¶ 43. At some point before 3:00 p.m.,[6] Graham saw Cassidy and informed him that the documents had been

---

[6] Plaintiffs make various allegations related to the specific timing of the meeting and events surrounding the meeting. But Plaintiffs' precise chronology of events is unclear (and such information would obviously be in the

sent to him and that he "needed to move forward from that point." *Id.* Plaintiffs allege that, upon information and belief, Cassidy did not know how to do what had to be done with the incomplete TDO paperwork. *Id.* ¶ 44. The TDO petition was never completed or filed. *Id.*

Just before 3:00 p.m. on the same day, February 1, 2022, Thompson was found dead in his cell. *Id.* According to Thompson's autopsy report, the cause of death was an acute pulmonary embolism. *Id.*

### B.   Procedural Background

On October 1, 2024, Plaintiffs filed their Complaint.  Dkt. 3.  After numerous consent extensions of time to file responses, all Defendants, except Beverly Franks,[7] filed their motions to dismiss. Dkts. 19, 23, 30, 36, 44, 49, 53.  Plaintiffs then filed their Opposition Briefs.  Dkts. 56-58.  On November 22, 2024, Plaintiffs filed a Motion for Voluntary Dismissal of three defendants, Arlington Community Services Board, Aubrey Graham, and Tatiana Campbell.   Dkt. 59. Accordingly, on December 2, 2024, this Court ordered all claims against Defendants Arlington Community Services Board, Aubrey Graham, and Tatiana Campbell dismissed with prejudice. Dkt. 62.  The Court further dismissed Arlington Community Services Board, Aubrey Graham, and Tatiana Campbell's motions to dismiss as moot.  *See id.* at 1 (dismissing Dkt. 30 and Dkt. 53 as moot).  The remaining Defendants then filed their Reply Briefs.  Dkts. 60, 61, 63.

On January 21, 2025, Plaintiffs filed a pending Motion for Leave to file Recent Appellate Authority.  Dkt. 64.

---

possession of Defendants), and so the times are omitted here.  Rather, the recitation of the facts here are streamlined except to make clear that all of these events occurred on the same day, before 3:00 p.m.

[7] Defendant Beverly Franks was served on October 28, 2024.  A responsive pleading was due from Defendant Franks by November 18, 2024.  Defendant Franks did not file a responsive pleading, nor has she made any appearance in this case.  Accordingly, this Court will refer the claims against Defendant Franks to the assigned U.S. Magistrate Judge for default judgment proceedings.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).  Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion.  *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## III. ANALYSIS

Plaintiffs' Complaint describes a tragic set of circumstances, which resulted in the unfortunate death of Thompson.  The difficult task that the Court faces with respect to this tragedy is in pinpointing whether the allegations in the Complaint are sufficient to plausibly allege a cause of action against *each* of the Defendants.  In their Motions to Dismiss, Defendants assert that Plaintiffs' allegations are insufficient.  After addressing some initial outstanding issues, the Court

8

will address each motion to dismiss and each Defendant in turn to determine whether the allegations are sufficient to plausibly assert a cause of action against that *specific* Defendant.

### A.    Count IV – Wrongful Death and Theories of Recovery

Plaintiffs allege wrongful death claims against a number of the Defendants in this case. These claims deal with Virginia Code § 8.01-50, which governs claims for the wrongful death of a decedent. Several Defendants collectively argue that the wrongful death statute does not provide for a freestanding claim but must be asserted in combination with a tort. Dkt. 24 at 7; Dkt. 36-1 at 7; Dkt. 45 at 7; Dkt. 50 at 7. Defendants specifically argue that wrongful death actions are not standalone causes of action. As the Fourth Circuit and various Virginia courts have noted, "Virginia's wrongful death statute does not create a new cause of action, but only a right of action in a personal representative to enforce the decedent's claim for any personal injury that caused death." *Miller v. United States*, 932 F.3d 301, 303 (4th Cir. 1991); *see also Culler v. Johnson*, 98 Va. Cir. 470, at *6 (Cty. of Roanoke Nov. 21, 2014) (holding that, "in Virginia, a wrongful death action is derivative of and is dependent on an injury claim"); *Harmon v. Birdmont Health Care*, 98 Va. Cir. 433, at *3 (Cntys. of Bland, Carroll, Floyd, Giles, Grayson, Montgomery, Pulaski, & Wythe Feb. 11, 2013) ("The language of Virginia's Wrongful Death Statute indicates that wrongful death actions have a derivative nature."). Thus, the wrongful death claims in Count IV merge with the underlying tort claims for negligence, gross negligence, and medical malpractice in Counts II and III. *See Darlington v. Harbour E. Village LLC*, 2020 WL 3979664, at *4 n.8 (E.D. Va. July 14, 2020) ("A wrongful death claim is the vehicle for a posthumous negligence claim."); *Sosa v. Hill*, 2025 WL 864291, at *8-9 (E.D. Va. Mar. 19, 2025). Thus, the motions to dismiss will be granted to the extent they argue that there can be no freestanding wrongful death claim and that the tort claims and wrongful death claims merge together. Accordingly, this Court

dismisses Count IV and directs Plaintiffs to replead the negligence, gross negligence, and medical malpractice claims in Counts II and III to accurately reflect the theory of recovery that they seek. Furthermore, in Plaintiffs' Complaint, Plaintiffs allege claims of negligence, gross negligence, and medical malpractice as Count II of the suit. Although styled as a single count, negligence and gross negligence are two separate claims, and each has its own legal standard. Accordingly, when relevant, the Court will address each of these separately. Additionally, a claim of medical negligence *against a health care provider* is the same cause of action as medical malpractice in Virginia. *See* Va. Code Ann. § 8.01-581.1; *Coston v. Bio-Med. Applications of Va., Inc.*, 275 Va. 1, 5 (2008). Accordingly, going forward, the Court will analyze negligence and medical malpractice as one claim for any Defendants who are healthcare professionals.

B.    The Referenced Jail Defendants' Motions to Dismiss

Defendants Mohammed Azam, Carol Chike, Shenita Cooper-White, Michael Derara, Javier Garcia-Ruiz, Donna McKay, Robyn Maas, Abu Smith, Dawn Treese-Scott, Samantha Slydell, and Cynthia Taferia (the "Referenced Jail Defendants") seek to dismiss each of the claims against them[8] based on Plaintiffs' alleged failure to set forth adequate facts to specifically establish any claims against the Referenced Jail Defendants.

The Court agrees with the Referenced Jail Defendants that the allegations in the Complaint contain a dearth of allegations that *specifically* relate to each of the Referenced Jail Defendants. Indeed, each of the Referenced Jail Defendants are only specifically named in the caption of the Complaint and in paragraph 3; and, although paragraph 3 does allege that the Referenced Jail Defendants were healthcare providers, there is no information in the Complaint regarding what

---

[8] Plaintiffs have asserted three claims against the Referenced Jail Defendants: (i) Count I – Fourteenth Amendment violation; (ii) Count II – negligence, gross negligence, medical malpractice; and (iii) Count IV – wrongful death (of which the Court has already disposed, *see supra*).

kind of providers they are. Dkt. 3 ¶ 3. The Motions make clear that the Referenced Jail Defendants are various kinds of nurses, but those facts are not included in the Complaint.

The key allegations against the Referenced Jail Defendants in the Complaint are only in the context of the "Jail Defendants" and are as follows: (i) "[e]ach of the jail defendants had renewed personal or direct supervisory dealings with or regarding Mr. Thompson following his return to the jail on January 21, 2022"; (ii) "[e]ach [of the Jail Defendants] should have been aware of [various] professional [medical] guidelines"; (iii) [e]ach [of the Jail Defendants] knew that [] Thompson suffered from a mental illness causing . . . noncompliance with medical recommendations, that the inflammation and associated pain in [] Thompson's legs decreased his mobility and led to his remaining seated in his wheelchair . . . , that he refused to elevate his legs, that he had required emergency admission to the hospital, that judicial authority had been solicited and received for him to receive involuntary medication for a potentially life-threatening condition, that he was continuing to manifest incapacity to make critical decisions about his health, and that he was at risk for DVT and acute pulmonary embolism"; (iv) following Thompson's return to jail after his hospital stay, "the jail defendants should have returned [Thompson] to the hospital's emergency room or otherwise secured an appropriate order for involuntary administration of the medication he required"; (v) "[t]he jail defendants did not prescribe any precautions or treatment to address the risk of DVT, did not cause [Thompson's] legs to be elevated, and did not examine his inter-digital toe spaces"; and (vi) "none of the jail defendants responded to [] Thompson's lethargic and untreated state until the day he died, other than by noting his refusal of treatment in [] Thompson's medical chart." Dkt. 3 ¶¶ 35-45. These allegations are generally conclusory and are insufficient to state a claim against the Referenced Jail Defendants with respect to each count.

1.    Fourteenth Amendment Claim

A claim brought on behalf of a pretrial detainee, like Thompson, is premised on the Fourteenth Amendment, because a pretrial detainee may not be "subject to any form of 'punishment.'" *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021). The scope of this claim is "unclear," but a pretrial detainee makes out a violation at least where "he shows deliberate indifference to serious medical needs" under cases interpreting the Eighth Amendment. *Id.* The test for an Eighth Amendment violation has been set forth by the Supreme Court in *Estelle v. Gamble*, 429 U.S. 97 (1976), and the cases interpreting it. As the Fourth Circuit has recognized, an Eighth Amendment claim for deliberate indifference to a serious medical need includes an objective and subjective element; namely, the medical condition must be serious, and the defendant must have acted with sufficiently culpable state of mind. *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citing *Famer v. Brennan*, 511 U.S. 825, 834 (1994)). Importantly, deliberate indifference requires that a defendant "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178.

The Fourth Circuit recently held that a correctional officer "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction" where the decedent "conveyed all of these facts—her recent suicide attempt [six weeks earlier], her daily drug use and consequent withdrawal, and her feelings of worthlessness," to the officer when being processed, and the officer "completed two health screening forms evaluating [decedent's] mental health." *Short v. Hartman*, 87 F.4th 593, 613 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024) (internal quotation marks omitted). The officer "also knew the excessive risk posed by her action or inaction" based on the prison's policy

identifying "suicide risk factors of which officers should be aware." *Id.* (factors included "previous attempts to commit suicide" and "depression"). And the officer "was not powerless to mitigate this risk—the Prison Policy lays out several steps [the officer] could have taken, including placing [decedent] in a populated cell, removing items such as bedsheets with which [decedent] could hang herself from the cell, and conducting regular checks every ten to fifteen minutes," but "took none of these steps." *Id.*

The allegations against the Referenced Jail Defendants as to Count I are insufficient to survive a motion to dismiss here because Plaintiffs do not sufficiently allege "in what capacity [the Referenced Jail Defendants] interacted with [Thompson], or how (or even if) [the Referenced Jail Defendants] w[ere] responsible for [Thompson's] medical treatment." *Langford v. Joyner*, 62 F.4th 122, 126 (4th Cir. 2023) (parentheses in original) (holding that the Court "require[s] sufficient facts to allow the [C]ourt to infer liability as to *each* defendant" (emphasis in original)). Rather, the allegations provided are extremely general. Plaintiffs allege that the Referenced Jail Defendants "had [either] renewed personal or direct supervisory dealings with or regarding . . . Thompson." Dkt. 3 ¶ 35. This is insufficient to establish in what capacity any of the Referenced Jail Defendants interacted with Thompson, or if they interacted with Thompson personally at all. Further, Plaintiffs' allegations of the Referenced Jail Defendants' knowledge of Thompson's medical conditions are similarly too general. Plaintiffs allege that "[e]ach [of the Jail Defendants] knew that . . . Thompson suffered from a mental illness, . . . [had] decreased . . . mobility, . . . and that he was at risk for DVT." Dkt. 3 ¶ 38. But Plaintiffs fail to identify how the Referenced Jail Defendants would have known this information. Such conclusory allegations are the type of "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" and "legal conclusions" that are insufficient to survive a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*,

550 U.S. at 555); *see also Langford*, 62 F.4th 122, 126 (noting that such types of deficient allegations do not "categorically foreclose the possibility that a complaint that makes allegations collectively against 'Defendants' may survive a motion to dismiss," but requiring that there be "sufficient facts to allow the [C]ourt to infer liability as to *each* defendant"); *Jordan v. Maryland*, 2024 WL 3597203 (D. Md. July 31, 2024) (holding that the plaintiff's "generalized, conclusory, and collective allegations' failed to plausibly allege deliberate indifference on the part of each Defendant" because plaintiff failed to identify "how each individual Defendant personally interacted with the plaintiff or was responsible for the denial of his . . . rights"). Accordingly, the Referenced Jail Defendants' motions will be granted on this basis.

### 2.    Negligence/Gross Negligence/Medical Malpractice Claims

The Referenced Jail Defendants also challenge whether the facts alleged against them support a negligence (medical malpractice) or gross negligence claim. Specifically, the Referenced Jail Defendants argue that the Complaint lacks any facts that would allow the Court to draw reasonable inferences that care provided by the Referenced Jail Defendants amounted to negligence, gross negligence, or medical malpractice.

#### i. Medical Malpractice/Negligence Claim

To prove a medical malpractice claim in Virginia, a plaintiff must establish (1) the applicable standard of care, (2) a deviation from that standard, and (3) that such deviation proximately caused the plaintiff's injuries. *Bryan v. Burt*, 254 Va. 28, 34 (1997); *Raines v. Lutz*, 231 Va. 110, 113 (1986).

Plaintiffs allege, and the Referenced Jail Defendants do not dispute, that the Referenced Jail Defendants are "health care provider[s]." Dkt. 3 ¶ 48. However, Plaintiffs fail to allege what kind of health care providers the Referenced Jail Defendants are, such that the Court is unable to

assess the duty of care owed to Thompson. Moreover, absent any indication of the kinds of interactions between the Referenced Jail Defendants and Thompson or allegations regarding what care the Referenced Jail Defendants specifically provided, or failed to provide, to Thompson, Plaintiffs allegations are simply conclusions. In other words, Plaintiffs fail to allege how the Referenced Jail Defendants breached their duty to Thompson. Further, Plaintiffs fail to allege how *the Referenced Jail Defendants' actions* specifically were the proximate cause of Thompson's death. Accordingly, Plaintiffs have not stated medical malpractice negligence claims against the Referenced Jail Defendants, and the Referenced Jail Defendants' motions will be granted in this regard.

### ii. Gross Negligence Claim

Virginia law defines gross negligence as "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Commonwealth v. Giddens*, 295 Va. 607, 613 (2018) (quoting *Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996)). "The standard for gross negligence [in Virginia] is one of indifference, not inadequacy." *Elliott v. Carter*, 292 Va. 618, 622 (2016).

Again, for the same reasons that the Court finds that Plaintiffs have failed to state deliberate indifference and medical malpractice claims against the Referenced Jail Defendants, the Court likewise concludes that Plaintiffs have not stated a claim for gross negligence. "[T]he Court finds no specific allegations in the [Complaint] to support a finding of . . . gross negligence" where "[n]othing in the [Complaint] establishes, in terms that are not merely conclusory, that [the Referenced Jail Defendants] knew about Thompson's . . . medical needs or his condition[s]." *Sosa v. Hill*, 2025 WL 864291, at *26 (E.D. Va. Mar. 19, 2025). Accordingly, the Referenced Jail Defendants' motions will be granted on this basis.

15

\*       \*       \*

In sum, this Court will grant the Referenced Jail Defendants' motions to dismiss as to all claims against them.

        C.      Meeting Participant Defendants' Motions to Dismiss

Defendants Mark Cassidy, Akame Ekwe, Shadi Ayyas,[9] David Ijeh, and Juan Nunez, also referred to as the Meeting Participant Defendants, seek to dismiss each of the claims against them[10] based on Plaintiffs' alleged failure state a claim for relief on any of the claims against the Meeting Participant Defendants. Dkt. 24.

The Complaint refers to the Meeting Participant Defendants as a part of the broader Jail Defendants group. Accordingly, the allegations against the Meeting Participant Defendants include the previously stated allegations against the Jail Defendants. *See supra* at 10-11. The Complaint, however, provides additional allegations against the Meeting Participant Defendants apart from the broader Jail Defendants group. Some of those allegations are as follows: the Meeting Participant Defendants were present at a meeting on February 1, 2022, on "the eleventh day following . . . Thompson's return to the jail," the Meeting Participant Defendants "recognized a need to return [Thompson] to the hospital on an emergency basis and secure another TDO"; Defendant Cassidy during the meeting stated: "We need to get him [Thompson] out of here. He needs to go back to the hospital."; the Meeting Participant Defendants "lack[ed] appropriate training and supervision" and did not know "who should apply for a new TDO, or how to do so"; after the meeting, the Meeting Participant Defendants "went to lunch"; Defendant Ayales asked

---

[9] Defendants assert, and Plaintiffs do not object to Defendants' assertion, that Defendant Shadi Ayyas and Defendant Dr. Ayales are the same individual, and the proper name of the Defendant is Dr. Shadi Ayyas. *See* Dkt. 24 at 11 n.2.

[10] Plaintiffs have asserted three claims against the Meeting Participant Defendants: (i) Count I – Fourteenth Amendment Violation; (ii) Count II – negligence, gross negligence, medical malpractice; and (iii) Count IV – wrongful death (which the Court already disposed of, *see supra*).

another individual "to find and fill out the forms for him to sign to secure the proposed medical TDO"; that individual sent the incomplete TDO forms to Defendant Cassidy; the TDO "petition was never completed or filed"; and, "[j]ust before 3 PM the same day, . . . Thompson was found dead in his cell" from "an acute pulmonary embolism." Dkt. 3 ¶¶ 40-44. These more specific allegations are sufficient to plausibly state claims against these Defendants.

1.    Fourteenth Amendment Claim

As stated *supra*, the standard for Plaintiffs' Fourteenth Amendment claim against the Meeting Participant Defendants is whether Thompson was able to show "deliberate indifference to serious medical needs." *Mays*, 992 F.3d at 300. The Court finds that the facts in this case as to the Meeting Participant Defendants are more similar to *Short* than they are as to the Referenced Jail Defendants.

In *Short*, the Fourth Circuit held that the decedent "conveyed all of [the relevant] facts . . . to [the relevant officer]" and the officer "completed two health screening forms evaluating [decedent's] mental health." *Short*, 87 F.4th at 613. The level of knowledge possessed by the Meeting Participant Defendants parallels *Short*. Plaintiffs allege that the Meeting Participants sat in on an approximately two-hour long meeting, during which Thompson's deteriorating condition was expressly acknowledged and discussed. Dkt. 3 ¶ 40. Implicit in these factual allegations is that each of the Meeting Participant Defendants had knowledge that Thompson was not doing well and was in danger. In fact, in the meeting, Defendant Cassidy stated that Thompson "need[ed] to go back to the hospital," thus showing awareness that Thompson was facing a serious medical condition or crisis. *Id.* Moreover, despite all of the difficulties that Thompson experienced before and during his time at the hospital, when he returned to the jail from the hospital, Dr. Ijeh, a psychiatrist, "could not" assess Thompson and yet no action was taken.

17

Dkt. 3 ¶ 37. Thus, Plaintiffs have plausibly alleged that the Meeting Participant Defendants had actual subjective knowledge of Thompson's serious medical condition.

Further, Plaintiffs also sufficiently allege that the Meeting Participant Defendants knew of the excessive risk posed by their inaction in this situation. Specifically, Plaintiffs allege that by making his statement that Thompson needed to return to the hospital urgently, Defendant Cassidy, had to be aware of the excessive risk posed if Thompson would not be returned to the hospital. Moreover, all of the Meeting Participant Defendants except for Defendant Cassidy are medical personnel, and Plaintiffs allege that they were all aware of medical guidelines for treatment of cellulitis and the risk of DVT in such patients. Thus, once they were made aware of Thompson's serious medical condition in the meeting, they had to be aware of the excessive risk posed by their inaction. This risk was realized when Thompson died of a pulmonary embolism, within two hours of the conclusion of the meeting.

Thus, this Court concludes that the Complaint sufficiently alleges that the Meeting Participant Defendants were deliberately indifferent to Thompson's serious medical needs by failing to follow through with care after the February 1, 11:30 a.m. meeting.

### 2.    Negligence/Gross Negligence/Medical Malpractice Claims

As discussed above, any medical malpractice claims under Virginia law merge with medical negligence for medical professionals. All of the Meeting Participant Defendants are identified as medical professionals, with the exception of Defendant Cassidy. Accordingly, the claims against Defendant Cassidy are negligence and gross negligence, and the claims against the remaining Meeting Participant Defendants are medical malpractice and gross negligence.

Because this Court has already determined that Plaintiffs have plausibly stated a claim against the Meeting Participant Defendants for deliberate indifference, the Court concludes that

there are likewise viable claims for negligence, medical malpractice, and gross negligence. *See Rucker v. Piedmont Reg'l Jail Auth.*, 2021 WL 3863346, at *8 (E.D. Va. Aug. 30, 2021) (denying motion to dismiss); *Hixson v. Hutcheson*, 2018 WL 814059, at *6 (W.D. Va. Feb. 9, 2018) ("[A] claim for gross negligence under Virginia law requires a lesser showing of recklessness than a claim for deliberate indifference under the Eight and Fourteenth Amendments."). Courts have likewise denied motions to dismiss which rested on similar facts. *See, e.g.*, *Adams v. NaphCare, Inc.*, 243 F. Supp. 3d 707, 720 (E.D. Va. Mar. 21, 2017) (denying motion to dismiss where defendants were accused of "let[ting] a pretrial detainee under one's care thirst and starve to death over the course of several months"); *Jennings v. Hart*, 602 F. Supp. 2d 754, 759 (W.D. Va. 2009) (denying motion where defendants were accused of ignoring an inmate's "worsening physical condition and repeated requests for help"). Accordingly, the Meeting Participant Defendants' motions will be denied on this basis.

### D.    Hospital Defendants' Motions to Dismiss

Defendants Dr. Jeanie Yoon ("Dr. Yoon"), Dr. C.M. Prasad ("Dr. Prasad"), C.M. Prasad, M.D., P.C. ("Prasad P.C."), Virginia Hospital Center Arlington Health System ("VHC AHS"), and Virginia Hospital Center Physician Group LLC ("VHC Physician Group") (collectively, the "Hospital Defendants") seek to dismiss each of the claims[11] against them based on Plaintiffs' alleged failure to state a claim for relief on any of the claims against the Hospital Defendants. Dkts. 20, 36.

---

[11] Plaintiffs assert a medical malpractice claim against Dr. Yoon and Dr. Prasad in Count III. Plaintiffs further assert a wrongful death claim against Dr. Yoon and Dr. Prasad in Count IV (as previously disposed of by this Court). Plaintiffs additionally allege claims under the Affordable Care Act ("ACA") against all of the Hospital Defendants in Counts XI, XII, and XIII.

1.    Medical Malpractice Claims

Plaintiffs assert medical malpractice claims against Dr. Yoon and Dr. Prasad for their treatment, or lack thereof, of Thompson during his one-day stay in the hospital. Dkt. 3 ¶ 49. The Court will address each Defendant individually.

a. Dr. Yoon

As referenced earlier, Virginia tort law applies to the medical malpractice claims brought in this suit. To prove a medical malpractice claim in Virginia, a plaintiff must establish (1) the applicable standard of care, (2) a deviation from that standard, and (3) that such deviation proximately caused the plaintiff's injuries. *Bryan v. Burt*, 254 Va. 28, 34 (1997); *Raines v. Lutz*, 231 Va. 110, 113 (1986). Specifically, "[i]n medical malpractice cases, as in other malpractice cases, the plaintiff must establish not only that the defendant violated the applicable standard of case, and was therefore negligence, but [they] must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death." *Brown v. Koulizakis*, 331 S.E.2d 440, 446 (Va. 1985).

A review of Plaintiffs' claim against Dr. Yoon reveals issues with drafting so that precise contours of Plaintiffs' claim are unclear. Namely, it is unclear to the Court whether Plaintiffs are alleging that Dr. Yoon committed medical malpractice based solely on the failure to obtain a second TDO or whether Plaintiffs also intended to allege, as a standalone basis for the claim, Dr. Yoon's "incomprehensibl[e] discharge [of] Mr. Thompson, with his hospital TDO still in force, fewer than 24 hours after his hospital admission, back to the jail whence he had come, with oral medication he would not take . . . as in fact occurred both at the jail and at the hospital." Dkt. 3 ¶ 49. The Court agrees with Defendants that, to the extent the claim hinges on a second TDO, Plaintiffs have failed to plead their claim beyond a speculative level, because they have failed to

20

allege facts to support that a new TDO could have been obtained or that it could have been obtained by Dr. Yoon.  Dkt. 63 at 2; *Twombly*, 550 U.S. at 555.  Because it is not clear that Plaintiffs intended to assert the other potential aspect of this claim, the Court will not address it here.[12] Accordingly, the Court will grant the Motion in this regard.

### b. Dr. Prasad

Plaintiffs raise a similar medical malpractice claim against Dr. Prasad, but here the claim is more clearly limited to the failure to pursue a second TDO.  Specifically, Plaintiffs assert that Dr. Prasad was the psychiatrist who did an evaluation of Thompson during his hospital stay on January 21, 2022.  Dkt. 3 ¶ 18.  Dr. Prasad noted that Thompson was a "poorly interactive psychotic mute," "appeared to have a long history of schizophrenia," and had "impaired cognitive and memory functions."  *Id.*  Dr. Prasad diagnosed Thompson as having an undifferentiated type of schizophrenia.  *Id.* ¶ 21.  Dr. Prasad advised Dr. Yoon that Thompson "did not meet criteria for inpatient psychiatric treatment."  *Id.* ¶ 24.  Plaintiffs allege that this assessment by Dr. Prasad, that Thompson did not meet the criteria for inpatient psychiatric treatment, was baseless and reckless. *Id.* ¶ 29.  Plaintiffs assert that, like Dr. Yoon, Dr. Prasad should have insisted on an extension of court-ordered involuntary medication for Thompson.  *Id.* ¶ 30.  Plaintiffs further allege Dr. Prasad's inaction amount to medical malpractice because he took no steps in pursuit of additional involuntary court-ordered care.  *Id.* ¶ 49.  The Court is unconvinced by Plaintiffs' arguments.

As with Dr. Yoon, Plaintiffs fail to assert that Dr. Prasad's failure to secure a second TDO proximately caused Thompson's death.  Again, Plaintiffs' allegations with respect to a second TDO, who should have sought one, and whether it would have been granted are conclusory and

---

[12] The Court also does not address any superseding cause arguments here.  As Dr. Yoon's Reply brief indicated, "[s]uperseding cause is simply not an issue we raised – at all." Dkt. 63 at 1.  If Plaintiffs amend this claim, however, the parties should be prepared to address that issue as well as other issues regarding the scope of any future claim against Dr. Yoon.

speculative. For these reasons, the Court will grant Dr. Prasad's motion as to the claim of medical malpractice against him.

### 2. ACA Claims Against the Doctor Hospital Defendants

Plaintiffs assert claims under the Affordable Care Act ("ACA"), 42 U.S.C. § 1811 et seq., against Dr. Yoon, VHC Physician Group (together, the "Yoon Defendants"), Dr. Prasad, Prasad P.C. (together, the "Prasad Defendants") (collectively, the "Doctor Hospital Defendants"). Dkt. 3 ¶¶58, 59. Plaintiffs allege that the Doctor Hospital Defendants, in violation of the ACA and the Rehabilitation Act ("RA"), "(a) ignored the non-administration of medication that . . . Thompson required according to hospital doctors' orders, (b) took no steps to secure the ongoing involuntary medication of . . . Thompson known to be required for his physical health, and (c) knowingly acquiesced in . . . Thompson's being prematurely dumped as a patient to a jail where they knew he had not been, and could and would not be, properly treated," because of Thompson's mental disability. Dkt. 3 ¶¶ 58-59.

The antidiscrimination provision of the ACA states: "an individual shall not, on the ground prohibited under . . . [Section 504 of the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]" 42 U.S.C. § 18116(a). The ACA thus incorporates discrimination claims under the RA. The RA prohibits discrimination against a qualified individual "solely by reason of her or his disability." 29 U.S.C. § 794. To state a claim for discrimination under the RA or ACA, a plaintiff must allege that he (1) has a disability, (2) is otherwise qualified to receive a public service, program, or activity, and (3) was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability. *Constantine v. Rectors & Visitors of George*

*Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005); *see also* 42 U.S.C. § 18116(a).[13]  A plaintiff

"need not show 'discriminatory animus' to prevail on a claim for damages under Title II of the

ADA or § 504 of the Rehabilitation Act." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 317,

405 (D. Md. 2011) (citing *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir.

1994)).  Disability discrimination includes both "deprivations based on prejudice, stereotypes, or

unfounded fear," *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 (1987), as well as

"'thoughtless[ ] and indifferent[ ]' discrimination, which arises not out of 'invidious animus' but

rather out 'of benign neglect.'"  *Basta v. Novant Health Inc.*, 56 F.4th 307, 315 (4th Cir. 2022)

(quoting *Alexander v. Choate*, 469 U.S. 287, 295 (1985)).[14]

Despite the Doctor Hospital Defendant's assertion to the contrary, the Court finds that

Plaintiffs have plausibly alleged that Thompson suffered from a mental disability.  A "disability"

under the RA is a "physical or mental impairment that substantially limits one or more major life

activities of an individual; a record of such impairment; or being regarded as having such an

impairment[.]" *Biniaris v. Hansel Union Consulting, PLLC*, 382 F. Supp. 3d 467, 472 (E.D. Va.

2019) (citing 42 U.S.C. § 12102(1); 29 U.S.C. § 705(9)(B)).  Here, the Complaint establishes that

Dr. Prasad noted that Thompson "[a]ppeared to have a long history of schizophrenia," was "poorly

---

[13] The Court notes that, though Defendants Dr. Yoon and Dr. Prasad do not raise this in their opposition, liability under Section 504 of the RA does not "extend to all employees who work at institutions that accept federal funds." *See J.S.H. v. Newton*, 654 F. Supp. 3d 7 (D. Mass. 2023); *see also Glanz v. Vernick*, 756 F. Supp. 632, 637 (D. Mass. 1991); *cf. Brady v. Weeks Med. Ctr.*, 2019 WL 6529870, at *5 (D.N.H. Nov. 12, 2019) (holding the same), *report and recommendation adopted*, 2019 WL 6529459 (D.N.H. Dec. 4, 2019) (conducting a similar analysis in the context of Title VI). In the Complaint, Plaintiffs conclusorily allege that Dr. Yoon and Dr. Prasad personally accept federal funds, which is ordinarily not enough to state a claim for relief, but the Court need not address this matter further as it will decide the ACA claims on other grounds.

[14] In their motions to dismiss, the Doctor Hospital Defendants state that in order for Plaintiffs to allege an ACA claim, they must plead that "an official of who at minimum has authority to address the alleged discrimination and to institute corrective measures . . . [had] actual knowledge of the discrimination . . . and fail[ed] adequately to respond," citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). Dr. Yoon and Dr. Prasad's reliance on *Gebser*, however, is misguided. *Gebser* provides the guidance for a Title IX sexual harassment case in a school setting. The context here greatly differs, and this Court is unaware of any case law that has applied the *Gebser* standard to ACA claims.

interactive," had a "paranoid disorder" and a "delusion disorder." Dkt. 3 ¶¶ 19-20. This is sufficient to allege disability under the ACA.

The Doctor Hospital Defendants argue that Plaintiffs' allegations are not sufficient to allege that Thompson was mentally disabled, but this Court disagrees. The Doctor Hospital Defendants assert that the condition must be "permanent to be a disability," citing *McDonald v. Pennsylvania*, 62 F.3d 92, 95-96 (3d Cir. 1995). Dkt. 20 at 14 (cleaned up); *see also* Dkt 36-1 at 9 (stating the same). This interpretation of *McDonald* is incorrect. Rather, *McDonald* holds that the disability must have a permanent *or long-term* impact or *expected long-term impact* resulting from the impairment. *McDonald v. Com. of Pa., Dep't of Pub. Welfare, Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995). So, the fact that Plaintiffs' failure to allege that Thompson's mental disability was not permanent does not preclude their claim. Rather, Plaintiffs sufficiently allege that Thompson was seriously mentally disabled, and he appeared to have a long history of schizophrenia. At this stage of litigation, these allegations are sufficient to establish that Thompson was disabled under the RA.[15]

Plaintiffs, however, fail to sufficiently allege that the Doctor Hospital Defendants' treatment of Thompson as a group was discriminatory under the RA. To the extent this claim also rests on the failure to obtain a second TDO, as discussed *supra*, this claim fails, because it is conclusory and speculative. Similarly, the claim is speculative to the extent it rests on allegations that the Doctor Hospital Defendants "caused Mr. Thompson to be prematurely dumped as a patient to a jail where they knew he had not been, and could and would not be, properly treated." Dkt. 3

---

[15] It is unclear to the Court why, regardless of what symptoms with which Thompson presented, the schizophrenia diagnosis would not fit even Defendant's interpretation of a permanent disability. The Court further notes that, "[g]enerally, courts have found that plaintiffs who suffer from schizophrenia have a disability for the purpose of the ADA because of the cognitive limitations that result from the condition." *Estate of LeRoux v. Montgomery Cnty., Md.*, 2023 WL 2571518, at *8 (Mar. 20, 2023) (collecting cases).

¶ 58. Accordingly, this Court must turn to the specific allegations as to the two subgroups of the Doctor Hospital Defendants.

### a. The Yoon Defendants

On the other hand, Plaintiffs have plausibly alleged a claim premised on the allegation that the Yoon Defendants "ignored the non-administration of medication that Mr. Thompson required according to hospital doctors' orders." *Id.* In this regard, the Yoon Defendants were aware of the TDO, knew that the TDO was issued on the basis of Thompson's mental incapacity, further diagnosed Thompson as mentally incapable, prescribed medication, knew that the medication was being refused, and failed to utilize the TDO to administer medication. The failure to utilize the TDO in order to ensure that Thompson would receive medication in the same way that a non-mentally disabled person would receive medication is sufficient to state an ACA claim. *Johnson v. Rappahannock Reg'l Jail Auth.*, 2024 WL 2882869, at *8 (E.D. Va. June 7, 2024) (finding that plaintiffs plausibly stated an ACA/RA claim by alleging defendants ignored plaintiff's requests for assistance due to her schizoaffective disorder). Thus, Plaintiffs have sufficiently stated a claim for relief under the ACA at this stage. *See Basta v. Novant Health Inc.*, 56 F.4th 307, 315 (4th Cir. 2022) (noting that discrimination under the ACA and/or RA may arise out of "benign neglect"). Thus, the motion will be denied in this regard.

### b. The Prasad Defendants

With respect to the Prasad Defendants, Plaintiffs by only conclusory allegations maintain that the Prasad Defendants failed to provide Thompson with what they believe would have been adequate treatment due to his disability. But as previously discussed, Plaintiffs have not alleged that any alternative treatment for Thompson was due. Further, Plaintiffs have failed to plausibly allege that the Prasad Defendants would have treated Thompson differently if not for his mental

disability. And Plaintiffs have not alleged that the Prasad Defendants would have any knowledge that any treatment provided to Thompson at the jail would be improper or insufficient. In fact, the facts as alleged show that the Prasad Defendants possessed the knowledge that Thompson had been transferred to them from ADC, thus leading to the likely assumption that any serious deterioration of Thompson would warrant a return to the hospital or emergency room.

In sum, Plaintiffs have failed to plead that the Prasad Defendants violated Thompson's rights under the ACA and RA, and their motions will be granted in this regard.

### 3. ACA Claim Against VHC AHS

Plaintiffs allege the same ACA and RA claims as to VHC AHS. In addition to the allegations as stated above, Plaintiffs additionally allege that during Thompson's stay in the hospital, despite the TDO, "staff nurses charged to administer medication to . . . Thompson repeatedly failed to do so simply because . . . Thompson objected. . . . They noted . . . Thompson's refusals in his medical chart." Dkt. 3 ¶ 26.

Evaluated at the motion to dismiss stage, Plaintiffs have plausibly alleged that the hospital nurses' apparent neglect or avoidance of Thompson, by way of failing to properly administer his medication, was because of his mental disability and resulting difficult demeanor. For the same reasons as for the Doctor Hospital Defendants, this is sufficient to state a claim at the motion to dismiss stage. *See Johnson*, 2024 WL 2882869, at *8; *see also Basta*, 56 F.4th at 315 (noting that discrimination under the ACA and/or RA may arise out of "benign neglect"). Accordingly, the Court will allow Plaintiffs' claim against VHC AHS for violation of the ACA to go forward.

E.    Mediko's Motion to Dismiss

Defendant Mediko seeks to dismiss each of the claims[16] against it based on Plaintiffs' alleged failure to state a claim for relief. Dkt. 24. Mediko is the corporation licensed and at all relevant times under contract herein to provide for-profit health care to jail inmates. Dkt. 3 ¶ 4.

1. Fourteenth Amendment Claims

Plaintiffs raise two new claims against Mediko under Section 1983, particularly Mediko's failure to supervise its employees and its failure to train its employees. Plaintiffs pursue a Section 1983 claim against Mediko, despite its status as a private entity because, as many judges in this District have recognized, "a private entity may, in certain cases, act under color of law within the meaning of [Section] 1983 and therefore be exposed to liability." *Riddick v. Watson*, 503 F. Supp. 3d 399, 415 (E.D. Va. 2020). The Fourth Circuit has observed that one way a private entity acts under color of law within the meaning of Section 1983 is when it "exercise[s] powers that are traditionally the exclusive prerogative of the state." *Conner v. Donnelly*, 42 F.3d 220, 224 (4th Cir. 1994). The Fourth Circuit has made clear that "the provision of medical services to inmates" fits that mold. *Id.*; *see also West v. Atkins*, 487 U.S. 42, 56 (1988) (recognizing that a state has a "constitutional duty to provide adequate medical treatment to those in its custody"). Plaintiff has alleged, and Mediko does not dispute, that Mediko contracted to provide medical services to detainees at the jail. Dkt. 3 ¶ 4. This allegation thus brings Mediko's acts within the purview of Section 1983.

Importantly, because Mediko is a private entity, it is more akin to a municipality than an individual and is thus subject to the standards that govern Section 1983 liability of municipalities.

---

[16] Plaintiffs have asserted five claims against Mediko: (i) Count IV – wrongful death (which the Court already disposed of, *see supra*); (ii) Count V – Fourteenth Amendment Violation for Failure to Train; (iii) Count VI – Fourteenth Amendment Violation for Failure to Supervise; (iv) Respondeat Superior; and (v) Count X – Affordable Care Act Violation.

*Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999) ("We have recognized, as has the Second Circuit, that the principles of [Section] 1983 municipal liability articulated by *Monell* and its progeny apply equally to a private corporation that employs [individuals working in prisons]."). Specifically, an entity (like Mediko) must have maintained an official policy or custom that caused a constitutional injury, and liability under Section 1983 premised on *respondeat superior* is insufficient. *See id.*; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). According to the Fourth Circuit, an official policy or custom can arise in four ways: (i) an express policy; (ii) decisions by a final decisionmaker; (iii) through omission, such as a failure to train; or (iv) through a persistent and widespread practice. *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

### a. Failure to Train

A plaintiff can establish the requisite "policy" for *Monell* liability through a failure to train, if it "reflects a 'deliberate' or 'conscious' choice" to not do so. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). A plaintiff must point out "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training." *Id.*; *see also, e.g., McDowell v. Grimes*, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018). Second, a plaintiff must establish that the municipality's failure to train showed a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original). Deliberate indifference is shown if "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights." *Harris*, 489 U.S. at 390; *accord. Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994). Finally, the plaintiff must show that "the officer's conduct resulted from said training," or lack

thereof. *McDowell*, 2018 WL 3756727, at *4 (quoting *Jones v. Chapman*, 2015 WL 4509871, at *18 (D. Md. July 24, 2015)).

As to Mediko's failure to train, Plaintiffs allege that Mediko failed to properly train employees on how to provide health care to "uncooperative, mentally ill patients." Dkt. 3 ¶ 51. Further, Plaintiffs specifically allege that Mediko employees were not properly trained on what steps to take to take to acquire a TDO or secure treatment for a patient who had to be transferred to a hospital for care. *See id.* ¶ 41 (alleging that Mediko staff, doe to a lack of appropriate training did not know "who should apply for a new TDO, or how to do so, or what their several options were for securing an involuntary placement of . . . Thompson in light of his refusal of necessary medication due to his mental illness."). Because Plaintiffs have alleged that Mediko failed to train its employees on how to secure necessary medical care in this way, Plaintiffs are able to point to a "specific deficiency" in training. Further, from the face of the Complaint, it is clear to the Court that the Meeting Participant Defendants, all Mediko employees, lacked training that made it extremely likely that an inmate suffering from an immediate medical crisis like Thompson would not be transferred to an appropriate medical facility because the employees did not know *who* should fill out the paperwork. Dkt. 3 ¶ 42 (the doctor asked Graham to fill out the required form, despite the form requiring certain sections to be completed by a doctor); *id.* ¶ 43 (Graham sent the partially completed form to Cassidy, also not a doctor, despite the form requiring certain sections to be completed by a doctor; *id.* ¶ 44 (the form was never completed). Lack of knowledge to complete such a rudimentary task shows deliberate indifference on the part of Mediko in this case. Accordingly, Plaintiffs have adequately stated a claim for relief under Section 1983 as to failure to train against Mediko.

29

b. Failure to Supervise

Plaintiffs raise similar allegations based on Mediko's failure to supervise its employees. To state a claim for failure to supervise, Plaintiffs must allege: "(1) that the supervisor had 'actual or constructive knowledge' that a subordinate was engaged in conduct that 'posed a pervasive and unreasonable risk of constitutional injury'; (2) that the supervisor's response to that knowledge 'was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices'; and (3) an 'affirmative causal link' between the supervisor's inaction and the plaintiff's alleged constitutional injury." *Brown v. Bratton*, 2020 WL 886142, at *34 (D. Md. Feb. 21, 2020) (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014)); *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). However, under *Monell*, "[a] failure to supervise gives rise to municipal liability 'only in those situations in which there is a history of widespread abuse.'" *Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 537 (D. Md. 2020) (quoting *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983)).

Here, Plaintiffs allege that a supervisor had actual or constructive knowledge that an employee was engaged in conduct that posed a serious risk of injury. Specifically, Plaintiffs allege that incomplete TDO materials were sent to Mediko COO – Defendant Cassidy, and sometime before 1:30 p.m. Defendant Cassidy was informed that the documents had been sent to him and that he "needed to move forward from that point." Dkt. 3 ¶ 43. The paperwork was never completed, Plaintiffs allege Defendant Cassidy never followed up, and Thompson passed less than two hours later. *Id.* ¶ 44. Although in an ordinary case these allegations may be sufficient to plausibly allege supervisory liability, here, Mediko is not an ordinary defendant. It is a corporation treated as a municipality. *See Austin*, 195 F.3d at 728. Accordingly, under the additional standard required by *Monell*, Plaintiffs must allege more. See *Washington*, 457 F. Supp. 3d at 537

(requiring a "history of widespread abuse" for a Monell failure to supervise claim). Here, Plaintiffs have not plausibly alleged sufficient facts to establish that Mediko engaged in this sort of behavior on a more widespread basis, rather than it being a singular incident that took place with Thompson. Accordingly, at this stage, Plaintiffs have failed to state a claim for municipal type liability for failure to supervise against Mediko, and Mediko's motion will be granted in this regard.

### 2. Liability under *Respondeat Superior*

Next, Plaintiffs allege a claim against Mediko under the doctrine of *respondeat superior* for the consequences of the state law torts, i.e., medical malpractice, negligence, and gross negligence, of their respective employees. Plaintiffs may recover damages against an actor's employers through the doctrine of *respondeat superior* "for the tortious acts of his employee if the employee was performing his employer's business and acting within the scope of his employment." *Kensington Assocs. v. West*, 234 Va. 430, 432 (1987). Here, Mediko's claim rises and falls with the claims against the Referenced Jail Defendants and the Meeting Participant Defendants. As the Court has determined that Plaintiffs have stated a claim against the Meeting Participant Defendants, and because it is clear that the Meeting Participant Defendants were acting within the scope of their employment, Plaintiffs have stated a claim for negligence, gross negligence, and medical malpractice under a theory of *respondeat superior* against Mediko. *See Riddick*, 503 F. Supp. 3d at 432 (concluding that claims against employer survived motion to dismiss). Thus, the Motion to Dismiss will be denied in this regard.

### 3. ACA Claim

Finally, Plaintiffs allege an ACA/RA claim against Mediko, stating that Mediko acted as an agent of the state and received federal financial assistance but failed to safeguard Thompson's health due to his mental disability. Dkt. 3 ¶ 56.

31

As discussed *supra*, to state a claim for discrimination under the RA or ACA, a plaintiff must allege that she (1) has a disability, (2) is otherwise qualified to receive a public service, program, or activity, and (3) was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

Here, for much the same reason that Plaintiffs' failure to train claim survives, so too does this ACA claim. As discussed *supra*, Thompson suffered from a disability which led him to refuse his medication. Despite knowledge of this disability and the inability of staff at the jail to further assess Thompson, Thompson went approximately eleven days without receiving necessary medication. And the face of the Complaint makes clear that this was due to Mediko's employees' failure to act in the face of his mental disability and inability to complete the requisite paperwork to assist Thompson in obtaining his medication like other prisoners. *See Johnson*, 2024 WL 2882869, at *8; *see also Basta*, 56 F.4th at 315 (noting that discrimination under the ACA and/or RA may arise out of "benign neglect"). Accordingly, Mediko's motion to dismiss will be denied in this regard.

## IV. CONCLUSION

Although there may be facts revealed in discovery that alter the determinations reached here regarding deliberate indifference, negligence, medical malpractice, and the ACA, Plaintiffs have, in large part, plausibly alleged claims against Defendants, with the exception of the Referenced Jail Defendants. Because this is the first time that Plaintiffs have received the benefit of the Court's views, the Court will permit *one* further round of amendment to address any of the claims the Court has dismissed.

32

Accordingly, it is hereby ORDERED that Count IV is DISMISSED as Plaintiffs cannot maintain a separate standalone count for wrongful death, as it is a derivative claim dependent on the underlying tort; and it is

FURTHER ORDERED that Defendants VHC Physician Group, VHC AHS, and Dr. Jeanie Yoon's Motion to Dismiss (Dkt. 19) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is granted insofar as the medical malpractice claims against Defendant Dr. Yoon are dismissed. The Motion is denied as to the ACA claims against VHC Physician Group, VHC AHS, and Dr. Yoon; and it is

FURTHER ORDERED that the Mediko Defendants' Motion to Dismiss (Dkt. 23) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is granted in so far as all claims against Defendants Mohammad Azam, Donna McKay, and Samantha Slydell are dismissed. The Motion is also granted as to the Failure to Supervise claim against Mediko. The Motion is otherwise denied; and it is

FURTHER ORDERED that Defendants C.M. Prasad and Prasad P.C.'s Motion to Dismiss (Dkt. 36) is GRANTED; and it is

FURTHER ORDERED that the Individual Mediko Defendants' Motion to Dismiss (Dkt. 44) is GRANTED; and it is

FURTHER ORDERED that Defendant Abu Smith's Motion to Dismiss (Dkt. 49) is GRANTED; and it is

FURTHER ORDERED that Plaintiff's Motion for Leave to File Supplemental Authority (Dkt. 64) is GRANTED; and it is

FURTHER ORDERED that Counts III, VI, and XIII are DISMISSED with leave to amend; and it is

FURTHER ORDERED that Plaintiffs' claims against Defendant Bethany Franks is REFERRED to the assigned U.S. Magistrate Judge for default proceedings pursuant to 28 U.S.C. § 636 and for preparation of a report and recommendation; and it is

FURTHER ORDERED that, if Plaintiffs so desire, Plaintiffs may file an amended complaint within THIRTY (30) DAYS of the entry of this Memorandum Opinion and Order. If Plaintiffs decline to file an Amended Complaint, then Plaintiffs are required to file a notice so-indicating and, if Plaintiffs decline to amend, Defendants shall have TWENTY-EIGHT (28) DAYS from receipt of the notice to file their answers, after which time a Scheduling Order will issue.

It is SO ORDERED.

Alexandria, Virginia
September 10, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge