IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| JOYCE AND LOUIS THOMSON, *as Personal Representatives of the Estate of Paul Thompson*,<br><br>Plaintiffs,<br><br>v.<br><br>MEDIKO, INC., *et al.*,<br><br>Defendants. | ) | Civil Action No. 1:24-cv-01736 (RDA/WBP) |

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendants Virginia Hospital Center Physician Group, Virginia Hospital Center, Arlington Health System, and Jeanie Yoon's Motion to Dismiss Amended Complaint (Dkt. 76) (the "VHC Motion") and the Mediko Defendants' Motion to Dismiss Amended Complaint (Dkt. 77) (the "Mediko Motion").[1] This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motions together with Plaintiffs' Amended Complaint (Dkt. 71), Defendants' Memoranda in Support (Dkts. 78, 79), Plaintiffs' Opposition Briefs (Dkts. 85, 86), and Defendants' Reply Briefs

[1] The Mediko Defendants include Defendants Mediko, Inc. ("Mediko"), Dr. Shadi Ayyas, Licensed Practical Nurse ("LPN") Mohammed Azam, Mark Cassidy, Nurse Practitioner ("NP") Carol Chike, LPN Shenita Cooper-White, Registered Nurse ("RN") Michael Derara, NP Akame Ekwe, RN Javier Garcia-Ruiz, Dr. David Ijeh, Robyn Maas, LPN Donna McKay, Dr. Juan Nunez, LPN Abu Smith, RN Samantha Slydell, RN Cynthia Taferi, and Qualified Mental Health Provider ("QMHP") Dawn Treese-Scott. Dkt. 79 at 1.

(Dkts. 87, 88), the Court GRANTS-in-PART and DENIES-in-PART the VHC Motion and DENIES the Mediko Motion.

## I. BACKGROUND

### A. Factual Background[2]

Plaintiffs Joyce and Louis Thompson ("Plaintiffs") bring this suit on behalf of Paul Thompson ("Thompson"), who was arrested and detained at the Arlington, Virginia Adult Detention Center ("ADC") from January 13, 2022, to February 1, 2022. Dkt. 71 ¶¶ 1, 2, 8, 34(g). Thompson is deceased, and Plaintiffs are the duly appointed personal representatives of the Estate. *Id.* ¶ 2.

On January 13, 2022, Thompson was arrested and subsequently detained pre-trial at ADC. *Id.* ¶ 8. Thompson declined to give his name to his arresting officer or the magistrate before whom he appeared, so at ADC, Thompson was booked under the name "John Doe." *Id.* Plaintiffs allege that, "[a]part from being manifestly mentally ill" at the time of his arrest, Thompson was suffering from severe redness and swelling in his legs, later diagnosed as cellulitis. *Id.* ¶ 9.

On January 20, 2022, ADC healthcare personnel transferred Thompson to the Virginia Hospital Center ("VHC") emergency department out of concern that Thompson's refusal of medical care could lead to life-threatening sepsis. *Id.* ¶ 10. After finding that Thompson's condition was sufficiently serious and that he lacked the capacity to refuse necessary medical care due to psychosis, VHC emergency department personnel immediately sought and obtained a temporary detention order ("TDO") on medical grounds. *Id.* ¶ 11. This TDO permitted involuntary evaluation and medication to treat Thompson's legs. *Id.* Thompson was then

[2] For purposes of considering the instant Motions to Dismiss, the Court accepts all facts contained within the Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

administered intravenous antibiotics by the VHC emergency department staff, who found that Thompson was suffering from cellulitis in addition to acute psychosis. *Id.* ¶ 12. Thompson was thereafter admitted into inpatient hospital care. *Id.* The physician who admitted Thompson to the hospital's inpatient medical floor noted "DVT prophylaxis: Lovenox."[3] *Id.* ¶ 14.

On January 21, 2022, Dr. C.M. Prasad ("Dr. Prasad") conducted a visit with Thompson in the hospital and made a consultation note that stated the following:

> P[atien]t brought in by police from Arlington county jail. Per report Pt. had worsening bilateral leg swelling since he has been in their custody. Patient is poorly interactive psychotic mute catatonic. Appeared to have a long history of schizophrenia. Appearance: [w]ell-developed, disheveled African-American male confused disorganized uncooperative catatonic poor self-care is with police escort as per the protocol at the jail. Behavior: [p]oorly interactive isolated. Speech: [p]oorly interactive mute. Mood: [D]epressed, sad, irritable, uncooperative. Affect: [d]isorganized thought process. Thought content: [A]ppears to be responding to internal stimuli. Sensorium: [p]atient is alert uncooperative poor eye contact. Cognition: impaired cognitive and memory functions. Insight: impaired.

*Id.* ¶¶ 16-17. Dr. Prasad gave Thompson a global assessment of functioning ("GAF") rating of 20-25 on a scale of 1-100. *Id.* ¶ 18. Dr. Prasad also diagnosed Thompson as having an undifferentiated type of schizophrenia. *Id.* ¶ 19. Dr. Prasad further noted that Thompson apparently had a "long history of schizophrenia" and that he appeared "confused, disorganized, uncooperative, catatonic, poorly interactive isolated, poorly interactive mute, depressed, sad, [and] irritable." *Id.* ¶ 33.

Dr. Yoon, Thompson's attending physician, prescribed an initial five days of continuing medication as treatment for his cellulitis. *Id.* ¶¶ 20, 23. The day after Thompson's admission to the inpatient ward, Dr. Yoon consulted with Dr. Prasad (after he had assessed Thompson) for input

[3] The Court notes that DVT likely refers to the condition deep vein thrombosis ("DVT"), which is where a blood clot develops in the deep veins, usually in the lower extremities. Lovenox is a medication given to address DVT and pulmonary embolisms in high-risk patients. Dkt. 71 ¶¶ 15-16.

on his mental health issues. *Id.* ¶ 21. Plaintiffs allege that, at this point, Dr. Yoon knew that Thompson:

> (a) was severely mentally ill, lacking insight into the seriousness of his medical condition and the need to comply with his doctors' treatment recommendations; (b) was known to have refused any and all medication voluntarily; (c) lacked capacity to refuse necessary medical care; (d) had received involuntary treatment for his medical condition the prior day due to the risks of serious harm caused by his refusal of care; (e) was at risk of DVT or pulmonary embolism given the infection in his lower legs and his decreased mobility; (f) would be discharged to a jail with uncertain if not unknown medical capacity; and (g) was virtually certain to continue refusing any and all medication if returned to the jail in his current condition, as jail staff expressly cautioned the hospital and as in fact occurred both at the jail and at the hospital.

*Id.*

Plaintiffs further allege that the hospital's nursing staff knew from Thompson's medical chart that he was refusing medication because of his mental illness and that a court order had been obtained to provide him involuntary medication. *Id.* ¶ 22. Yet, on numerous occasions, staff nurses failed to administer medication because Thompson objected. *Id.* Plaintiffs allege that the nurses acted in knowing disregard of the existing TDO and in gross dereliction of their professional obligations as nurses. *Id.* The nurses noted Thompson's refusals in his medical chart and Dr. Yoon was on notice of Thompson's refusals from these notes. *Id.*

Despite Thompson's refusal of medication and the nursing staff's failure to administer the prescribed medication, Dr. Yoon discharged Thompson back to the jail before the expiration of the 24-hour TDO. *Id.* ¶ 25. Upon discharge, Dr. Yoon provided Thompson with a prescription of five days' worth of oral medication. *Id.* Plaintiffs allege that Dr. Yoon's decision to discharge Thompson back to the jail was "unfathomable, baseless, and reckless" and reflected her disregard for the fact that Thompson's condition could only be treated through court-ordered involuntary

medication. *Id.* ¶ 26. Upon information and belief, Plaintiffs allege that Thompson's discharge was based on

> (a) the substantial burdens and inconvenience of contending with a mentally ill patient whose psychiatric condition rendered him uncooperative and in need of forcible medication, and (b) the time-consuming burdens and inconvenience of attending to the monitoring, record-keeping and filings required to maintain []Thompson involuntarily in the hospital under a new court order, or to transfer him to an appropriate secure facility for involuntary care.

*Id.* ¶ 27. Plaintiffs allege that Thompson's mental illness rendered him a "disfavored medical patient" which led to his speedy and untimely discharge from the hospital. *Id.*

Thompson's discharge, less than twenty-four hours after his admission, was authorized by Dr. Yoon. *Id.* ¶ 29. Plaintiffs allege that Dr. Yoon had no knowledge of the medical facilities, procedures, staffing, or capabilities of the jail in which Thompson would be held. *Id.* ¶ 28. Rather, Dr. Yoon only knew that the jail, the previous day, had sent Thompson to the hospital's emergency room for treatment after deeming itself incapable of providing proper treatment. *Id.* Plaintiffs assert that Dr. Yoon could, and should, have insisted on an extension of the TDO to safeguard Thompson. *Id.* ¶ 24. Namely, Plaintiffs claim Dr. Yoon could have extended the TDO by "invoking the procedures available under any of several Virginia statutes providing for court-ordered involuntary treatment of at-risk patients, just as a temporary involuntary medication order had been obtained the day before at the instance of . . . the virtually identical situation." *Id.*

Following his return to ADC, Thompson resumed his prior refusal of all medical and mental health care. *Id.* ¶ 32. Thompson remained lethargic, wheelchair-bound, and spent nearly 24 hours per day in his wheelchair. *Id.* Thompson did not take the antibiotics provided by the hospital. *Id.* Thompson's uncooperative and catatonic demeanor and behavior did not change following his discharge from the hospital back to the jail. *Id.* ¶ 33. Dr. Ijeh, a psychiatrist at the jail, noted that Thompson could not be assessed mentally. *Id.* Plaintiffs allege that Thompson

became increasingly at risk of DVT and pulmonary embolism with each passing day. *Id.* ¶ 32. The "jail defendants did not prescribe any precautions or treatment to address the risk of DVT, did not cause his legs to be elevated, and did not examine his inter-digital toe spaces," which Plaintiffs allege are "necessary and appropriate for a patient with cellulitis." *Id.*

Plaintiffs allege that each of the "Mediko Jail Defendants"[4] had renewed personal or direct supervisory dealings with or regarding Thompson following his return to the jail on January 21, 2022. *Id.* ¶ 34. Plaintiffs allege that each of them was or should have been aware of various professional guidelines regarding treatment and consequences of cellulitis and DVT. *Id.* Plaintiffs allege that each knew that Thompson:

> suffered from a mental illness causing a lack of insight and noncompliance with medical recommendations, that the inflam[m]ation and associated pain in Mr. Thompson's legs decreased his mobility and led to his remaining seated in his wheelchair with legs in a passive position, that he refused to elevate his legs, that he had required emergency admission to the hospital, that judicial authority had been solicited and received for him to receive involuntary medication for a potentially life-threatening condition, that he was continuing to manifest incapacity to make critical decisions about his health, and that he was at risk for DVT and acute pulmonary embolism, possibly to the point of death.

*Id.* ¶ 34. Plaintiffs allege that none of the Mediko Jail Defendants responded to Thompson's lethargic and untreated state until the day he died other than by noting his refusal of treatment in Thompson's medical chart. *Id.* ¶ 35.

---

[4] Defendants Shadi Ayyas, Mohammed Azam, Mark Cassidy, Carol Chike, Shenita Cooper, Michael Derara, Akame Ekwe, Javier Garcia-Ruiz, David Ijeh, Robyn Maas, Donna McKay, Dr. Juan Nunez, Abu Smith, Dawn Treese-Scott, Samantha Slydell, and Cynthia Taferi are the "Mediko Jail Defendants."

Plaintiffs allege that LPN Mohammed,[5] NP Carol Chike,[6] LPN Shenita Cooper,[7] RN Michael Derera,[8] Nurse Beverly Franks,[9] RN Javier Garcia-Ruiz,[10] Nurse Donna McKay,[11] LPN Abu Smith,[12] RN Samantha Slydell,[13] and RN Cynthia Taferi[14] each individually failed to

> complete a full nursing assessment including noting the status of Thompson's rash, leg swelling, etc.; document Thompson's status such as whether he ate all meals, drank fluids, got out of his wheelchair consistently, performed activities of daily living, etc.; develop an individualized care plan to address assessment findings (including risk of cellulitis progressing to sepsis, risk of DVT/PE due to immobility, etc.); notify the medical provider of Thompson's ongoing immobility and refusal to take medications; act as a patient advocate (e.g., escalate concerns up the chain of command if the provider failed to adequately address them), and document all the above activities.

---

[5] LPN Mohammed Azam provided care for Thompson on January 22, 27, 28, 29, and 30, 2022. Dkt. 71 ¶ 34(a). Plaintiffs allege that the failures occurred on each of those days. *Id.*

[6] Nurse Practitioner Carol Chike provided care for Thompson on January 14, 19. 22, and 26, 2022. *Id.* ¶ 34(b). Plaintiffs allege that the failures occurred on each of those days. *Id.*

[7] LPN Shenita Cooper provided care for Thompson on January 13, 14, and 30, 2022. *Id.* ¶ 34(c). Plaintiffs allege that the failures occurred on each of those days. *Id.*

[8] RN Michael Derera provided care for Thompson on January 27, 2022. *Id.* ¶ 34(d). Plaintiffs allege that the failures occurred on said date. *Id.*

[9] Nurse Beverly Franks provided care for Thompson on January 16, 24, and 30, 2022. *Id.* ¶ 34(e). Plaintiffs allege that the failures occurred on each of those days. *Id.*

[10] RN Javier Garcia-Ruiz provided care for Thompson on January 19, 23, 28, 29, and 31 and February 1, 2022. *Id.* ¶ 34(f). Plaintiffs allege that the failures occurred on each of those days. *Id.*

[11] Nurse Donna McKay provided care for Thompson on January 15, 16, 18, and 20, 2022. *Id.* ¶ 34(h). Plaintiffs allege that the failures occurred on each of those days. *Id.*

[12] LPN Abu Smith provided care for Thompson on January 25, 26, and 27, 2022. *Id.* ¶ 34(i). Plaintiffs allege that the failures occurred on each of those days. *Id.*

[13] RN Samantha Slydell provided care for Thompson on January 23, 30 and 31, 2022. *Id.* ¶ 34(j). Plaintiffs allege that the failures occurred on each of those days. *Id.*

[14] RN Cynthia Taferi provided care for Thompson on January 22 and 27, 2022. *Id.* ¶ 34(k). Plaintiffs allege that the failures occurred on each of those days. *Id.*

*Id.* ¶ 34(a)-(f), (h)-(k). Additionally, Nurse Supervisor Robyn Maas allegedly was aware that Thompson was refusing all medical care and could develop sepsis by at least January 19, 2022. *Id.* ¶ 34(g). However, following Thompson's return from the hospital on January 20, Maas took no reported action to ensure he received appropriate treatment. *Id.*

Dr. Ayyas saw Thompson on January 18 and 19, 2022. *Id.* ¶ 36(a). On January 19, Dr. Ayyas noticed that Thompson had a cellulitis-like rash and ordered amoxicillin. *Id.* At that point, Dr. Ayyas reviewed the discharge paperwork on January 24 and ordered an antibiotic called Augmentin. *Id.* On January 28, Dr. Ayyas reviewed Thompson's medication administration record, which showed that Thompson had refused all antibiotics doses. *Id.* Dr. Ayyas wrote "not doing well. He needs psych to follow up with him." *Id.* Dr. Ayyas was aware of Thompson's mental state and immobility but took no action to address the fact that said medical issues put Thompson at high risk for DVT and pulmonary embolism. *Id.* Dr. Ayyas and other health care personal did not discuss further steps to address Thompson's medical condition until the day Thompson died, February 1, 2022. *Id.*

NP Ekwe saw Thompson on January 14, 18, 19, 20, 24, 25, 27, and 31, 2022. *Id.* ¶ 36(b). On all the days NP Ekwe saw Thompson, Thompson failed to engage with him. *Id.* Such failure to engage is a common sign of mental illness. *Id.* However, NP Ekwe failed to act on such warning signs beyond giving "education."[15] NP Ekwe documented the need for Thompson to have psychotropic medication but never prescribed any or caused any to be prescribed. *Id.* NP Ekwe witnessed signs of catatonia on January 24, 25, 27, and 31, 2022. *Id.* NP Ekwe was aware from

[15] It is unclear what is meant by "education." Plaintiffs also are unsure of what "education" means, noting "whatever [education] meant and however palpably inefficacious it was." Dkt. 71 ¶ 36(b).

notes and referrals that Thompson was refusing medicine for his cellulitis and yet did not provide anything beyond "education." *Id.*

QMHP Dawn Treese-Scott tried to complete a mental health assessment for Thompson on January 14, 18, and 25, 2022. *Id.* ¶ 36(c). On each attempt, QMHP Treese-Scott noted various signs of severe mental illnesses, such as Thompson's failure to engage with her. *Id.* QMHP Treese-Scott allegedly failed to act upon the displayed signs of catatonia and did not secure additional intervention for Thompson. *Id.*

On February 1, 2022, eleven days after Thompson's return to the jail from the hospital, a subset of the Mediko Jail Defendants, including Dr. Ijeh, Ekwe, Dr. Nunez, Cassidy, and Dr. Ayales (the "Meeting Participant Defendants"), participated in a meeting where Thompson's medical condition was discussed. *Id.* ¶ 37. In that meeting, it was recognized that Thompson needed to return to the hospital on an emergency basis and that another TDO needed to be secured. *Id.* In the meeting, Cassidy said: "We need to get [Thompson] out of here. He needs to go back to the hospital." *Id.* The meeting began at 11:30 a.m. and ended at 1:30 p.m. *Id.*

Plaintiffs allege that, due to a lack of appropriate training and supervision, none of the Meeting Participant Defendants knew who should apply for a new TDO, how to do so, or what other options were available for securing involuntary placement of Thompson. *Id.* ¶ 38. Despite discussing the urgency of the situation during the meeting, the Meeting Participant Defendants went to lunch after the meeting. *Id.* After returning from lunch, Dr. Ayyas asked Graham to find and fill out the necessary forms for him to sign to secure the proposed medical TDO for Thompson. *Id.* ¶ 39. Graham, who allegedly had no experience with TDOs, located what she understood to be the necessary documents and "filled them out to the best of her ability." *Id.* Graham, however, could not complete the form because a doctor was required to make certain entries. *Id.* Plaintiffs

allege that because Graham was not properly trained or supervised, she did not know which person or entity would be the proper petitioner for the medical TDO. *Id.*

After preparing (an incomplete) TDO, Graham sent the materials to Cassidy. *Id.* ¶ 40. At some point before 1:30 p.m., Graham saw Cassidy and informed him that the documents had been sent to him and that he "needed to move forward from that point." *Id.* Upon information and belief, Cassidy did not know how to do what had to be done with the incomplete TDO paperwork. *Id.* ¶ 41. Plaintiffs allege that Mediko had not trained any of its staff on how to obtain a TDO and, because of the lack of training, the TDO petition was never completed or filed. *Id.*

Just before 3:00 p.m. on the same day, February 1, 2022, Thompson was found dead in his cell. *Id.* According to Thompson's autopsy report, the cause of death was an acute pulmonary embolism. *Id.*

B. Procedural Background

On October 1, 2024, Plaintiffs filed their Complaint. Dkt. 3. After initial Motions to Dismiss were filed, the Court issued a Memorandum Opinion and Order which granted-in-part and denied-in-part the various Motions, but provided for leave to amend. Dkt. 69.[16]

On October 8, 2025, Plaintiffs filed their Amended Complaint. Dkt. 71. On October 22, 2025, the VHC Motion and the Mediko Motion were filed. Dkts. 76, 77, 78, 79. Plaintiffs filed

[16] Defendant Beverly Franks was served on October 28, 2024. A responsive pleading was due from Defendant Franks by November 18, 2024. Defendant Franks did not file a responsive pleading, nor has she made any appearance in this case. Accordingly, this Court referred the claims against Defendant Franks to the assigned U.S. Magistrate Judge for default judgment proceedings. A Clerk for the United States District Court for the Eastern District of Virginia Alexandria Division entered the default of Beverly Franks for failure to plead or otherwise defend as provided by the Federal Rules of Civil Procedure. Dkt. 73.

their Oppositions on November 12, 2025. Dkts. 56, 57, 58. On November 18, 2025, the Replies were filed. Dkts. 87, 88.

On December 30, 2025, Plaintiffs moved for leave to file a recent decision from the Fourth Circuit. Dkt. 89.

## II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

## III. ANALYSIS

As this Court has previously noted, Plaintiffs' Amended Complaint describes a tragic set of circumstances resulting in the unfortunate death of Thompson. And, the task before the Court highlights the difficulty of pinpointing whether the allegations in the Amended Complaint are sufficient to plausibly allege a cause of action against *each* of the Defendants. In their Motions to Dismiss, Defendants assert that Plaintiffs' allegations are insufficient. Dkts. 76, 77. The Court will address each Motion and each Defendant in turn to determine whether the allegations plausibly assert a cause of action against *that* specific Defendant.

### A. The Mediko Jail Defendants

The Mediko Jail Defendants seek to partially dismiss Count II as to the Gross Negligence claims against all sixteen Mediko Jail Defendants. Dkt. 79. The Mediko Jail Defendants additionally seek to dismiss Count II, as to the medical malpractice claims against the nine Jail Defendants with nursing positions (the "Nursing Jail Defendants").[17] *Id.*

#### 1. Gross Negligence

Plaintiffs assert that each of the Mediko Jail Defendants fell below the standard of care required of Virginia healthcare workers in a manner that was negligent, grossly negligent, and materially contributed to Thompson's suffering and death. Dkt. 71 ¶ 45. The Mediko Jail Defendants argue that they are not grossly negligent because they showed at least some degree of care to Thompson. Dkt. 79 at 6. At this early stage, this Court finds it premature to dismiss Plaintiffs' gross negligence claims.

---

[17] The Mediko Jail Defendants with nursing positions are (1) Mohammed Azam, LPN; (2) Carol Chike, NP; (3) Shenita Cooper-White, LPN; (4) Michael Derara, RN; (5) Javier Garcia Ruiz, RN; (6) Donna McKay, LPN; (7) Abu Smith, LPN; (8) Samantha Slydell, RN; and (9) Cynthia Taferi, RN (collectively, the "Nursing Jail Defendants").

Virginia law defines gross negligence as "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight diligence, or the want of even scant care." *Commonwealth v. Giddens*, 295 Va. 607, 613 (2018) (quoting *Chapman v. City of Va. Beach*, 252 Va. 186, 190 (1996)). "The standard for gross negligence [in Virginia] is one of indifference, not inadequacy." *Elliott v. Carter*, 292 Va. 618, 622 (2016). To prevail on a gross negligence claim, Plaintiff must show "a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness." *Id.* "Whether or not gross negligence has been proved depends on the facts and circumstances of each case, and it is often a difficult task to determine whether the facts and reasonable inferences therefrom in a given case do or do not show gross negligence as a matter of law." *Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 574 (E.D. Va. 2020) (cleaned up) (quoting *Walloer v. Martin*, 144 S.E.2d 289, 292 (Va. 1965)). Because determining a gross negligence claim is a fact-laden inquiry, "courts frequently deny motions to dismiss gross negligence claims as premature." *B.R. v. F.C.S.B.*, 2023 WL 2464975, at *22 (E.D. Va. Mar. 10, 2023).

Here, Plaintiffs have alleged sufficient facts for their gross negligence claims to move forward. The Mediko Jail Defendants point to the language of the Amended Complaint to establish that they showed Thompson "some degree of care." Dkt. 79 at 6. Specifically, the Mediko Jail Defendants assert that they transferred Thompson on an emergency basis to the hospital, Dkt. 71 ¶¶ 1, 10, "acknowledged that Mr. Thompson's dire medical condition made it necessary for him to be transported back to the hospital," *id.*, "interacted with or supervised those interacting with Mr. Thompson," *id.* ¶ 3, "[p]rovided Mr. Thompson with a wheelchair," *id.* ¶ 9, were "[c]oncerned that Mr. Thompson's refusal of medical care could lead to life threatening sepsis," *id.* ¶ 10, "documented the need for Mr. Thompson to begin psychotropic medication," *id.* ¶ 36(b),

attempted to complete a mental health assessment for Thompson in which "various signs of severe mental illness" were noted, *id.* ¶ 36(c), and asked "an employee of the local Community Services Board, to find and fill out the forms for [Defendant Ayyas] to sign to secure the proposed medical TDO." *Id.* ¶ 39.

However, there is tension between many of the Mediko Jail Defendants' assertions and the meaning of the excerpts in context. For example, the Mediko Jail Defendants argue that "the [Jail Defendants] . . . provided Mr. Thompson with a wheelchair." Dkt. 79 at 6. However, the Amended Complaint only claims that Thompson sat in a "wheelchair provided to him by the jail." Dkt. 71 ¶ 9. The Amended Complaint does not specify which, if any, of the Mediko Jail Defendants provided the wheelchair to Thompson. Similarly, the Mediko Jail Defendants assert that they "transferred [Thompson] on an emergency basis to Defendant Virginia Hospital Center." Dkt. 79 at 6. Yet, the Amended Complaint reads "[j]ail staff transferred [Thompson] on an emergency basis to [D]efendant Virginia Hospital Center." Dkt. 71 ¶ 1. Again, it is unclear who, if any, of the Mediko Jail Defendants transferred Thompson to the hospital.[18]

Due to said discrepancies and uncertainties, dismissal of Plaintiffs' gross negligence claims would be premature at this juncture. Accordingly, the Court denies the Mediko Motion with respect to gross negligence as asserted in Count II.

---

[18] Similar uncertainties present themselves throughout the Mediko Jail Defendants' assertions. The claim that the Mediko Jail Defendants acknowledged Thompson's "dire medical condition" and the need to transport Thompson to a hospital is attributed to "defendant medical and mental health care personnel at the jail" in the Amended Complaint. Dkt. 71 ¶ 1. The concern that Thompson's refusal of medical care could lead to "life-threatening sepsis" was attributed to "ADC health-care personnel," *id.* ¶ 10, rather than the specific Mediko Jail Defendants as asserted in the Mediko Defendants' Memorandum of support. Dkt. 79 ¶ 6. A generalized concern with no connection to any specific Defendant and which did not result in action by any Defendant does not suffice to defeat a gross negligence claim at this early stage of the proceedings.

2. Medical Malpractice

Plaintiffs additionally assert that the Nursing Jail Defendants committed medical malpractice. Dkt. 71 ¶ 45. Defendants claim that Plaintiffs: (1) fail to establish what the applicable standard of care is for the Nursing Jail Defendants: (2) fail to allege any facts that support a causal connection between the Nursing Jail Defendant's conduct and Thompson's death; and (3) fail to sufficiently plead the personal involvement of the Nursing Jail Defendants. Dkt. 86 at 3; Dkt. 79 at 8. However, the Court finds that Plaintiffs have plausibly alleged that the Nursing Jail Defendants had a standard of care, that the Nursing Jail Defendants breached this standard of care, and said breach was a proximate cause of Thompson's passing.

To prove a medical malpractice claim in Virginia, a plaintiff must establish (1) the applicable standard of care, (2) a deviation from that standard, and (3) that such deviation proximately caused the plaintiffs injuries. *See Bryan v. Burt*, 254 Va. 28, 34 (1997); *Raines v. Lutz*, 231 Va. 110, 113 (1986). Specifically, "[i]n medical malpractice cases, as in other malpractice cases, the plaintiff must establish not only that the defendant violated the applicable standard of case, and was therefore negligent, but [they] must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death." *Brown v. Koulizakis*, 229 Va. 524, 532 (1985).

Plaintiffs allege, and the Nursing Jail Defendants do not dispute, that the Nursing Jail Defendants are "health care providers." Dkt. 71 ¶ 3. Plaintiffs specify that the Nursing Jail Defendants are LPNs, NPs, or RNs. *Id.* Although Defendants argue that Plaintiffs failed to allege the applicable standards of care for LPNs, RNs, and NPs (Dkt. 87 at 5-6), the Court disagrees. Plaintiffs allege that the Nursing Jail Defendants fell below the standard of care required under Virginia law. Plaintiffs asserted that the Nursing Jail Defendants "failed to provide Mr. Thompson

with the skill and diligence of reasonably prudent practitioners in their respective fields of practice," and "thereby fell below the standard of care required under Virginia law." *Id.* ¶ 45. The Virginia Code defines "standard of care" as the "degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth." VA. CODE § 8.01–581.20(A). The Virginia Code further specifies that this standard of care applies to nurses. *Id.* The Amended Complaint further identifies, with respect to each specific Nursing Jail Defendant, when they were involved in Thompson's care and in what alleged failings they engaged. Dkt. 71 ¶ 34. Accordingly, the Court finds that Plaintiffs have plausibly alleged that all Nursing Jail Defendants qualify as "nurses" under the Virginia Code, and thus the accompanying statutory standard of care is applicable.

Additionally, Plaintiffs has alleged that the Clinical Practice Guidelines of the Infectious Disease Society of America's (the "Infectious Disease Guidelines") for evaluation and treatment of cellulitis. *Id.* ¶ 34. The Infectious Disease Guidelines[19] referenced by Plaintiffs in the Amended Complaint recommend, in evaluating and treating cellulitis, antimicrobial therapy for five days (with an extension of treatment if the infection has not been improved). *Id.* ¶ 15. Additionally, the affected area should be elevated, and predisposing factors or underlying cutaneous disorders should be treated. *Id.* The Infectious Disease Guidelines specify that clinicians should carefully examine interdigital toe spaces and note that outpatient therapy is not recommended for patients with altered mental status. *Id.* Rather, hospitalization is recommended for patients with "poor adherence to therapy." *Id.* Plaintiffs note that each of the Nursing Jail Defendants was or should have been aware of the Infectious Disease Guidelines for treatment of cellulitis. *Id.* ¶ 15.

[19] Dennis L. Stevens, et al., *Clinical Practice Guidelines for the Diagnosis and Management of Skin and Soft Tissue Infections: 2014 Update by the Infectious Diseases Society of America*, 59(2) CLINICAL INFECTIOUS DISEASES 10, 15-16 at § IV, ¶¶ 4-7.

Considering the Infectious Disease Guidelines for treating and evaluating cellulitis and the Virginia Code, the Court finds that Plaintiffs plausibly pleaded that the Nursing Jail Defendants had a standard of care to Thompson.

The Court additionally finds that Plaintiffs plausibly alleged that the Nursing Jail Defendants deviated from said standard. Despite their awareness of Thompson's dire medical condition, the Nursing Jail Defendants failed to:

> complete a full nursing assessment including noting the status of Thompson's rash, leg swelling, etc.; document Thompson's status such as whether he ate all meals, drank fluids, got out of his wheelchair consistently, performed activities of daily living, etc.; develop an individualized care plan to address assessment findings (including risk of cellulitis progressing to sepsis, risk of DVT/PE due to immobility, etc.); notify the medical provider of Thompson's ongoing immobility and refusal to take medications; act as a patient advocate (e.g., escalate concerns up the chain of command if the provider failed to adequately address them), and document all the above activities.[20]

Dkt. 71 ¶¶ 34(a)-(d), (f), (h)-(k). Additionally, Plaintiffs assert that the "jail defendants did not prescribe any precautions or treatment to address the risk of DVT, did not cause his legs to be elevated, and did not examine his inter-digital toe spaces . . .". *Id.* ¶ 32.

Although Plaintiffs do not use the talismanic language that a "reasonably prudent nurse" would not have committed said failures, Plaintiffs asserted that the inactions were "professionally substandard" which is substantially the same. Additionally, the failures to elevate Thompson's legs and examine his inter-digital toe spaces run counters to the guidelines set forth by the

[20] Plaintiffs allege the same claims for each of the Nursing Jail Defendants individually. Although Defendants assert that the verbatim allegations against each of the individual Nursing Jail Defendants is impermissible, the Plaintiffs have plausibly supported that each Nursing Jail Defendant similarly failed to act (on their respective interactions with Thompson – which are identified) and, thus, each of the Nursing Jail Defendants are alleged to have failed to act in a reasonably prudent manner in the same way. Where there is no basis on which to distinguish between the actions of the various Nursing Jail Defendants, the Plaintiffs' allegations that they each failed to act in an identified manner and on identified days, suffices at this early pleading stage.

Infectious Disease Guidelines for treating and evaluating cellulitis. Therefore, the Court finds that Plaintiffs plausibly asserted that the Nursing Jail Defendants breached their duty.

Lastly, Plaintiffs sufficiently alleged that the Nursing Jail Defendants' deviation from the standard of care proximately caused Thompson's death. Defendants assert that the Amended Complaint's language concedes that the Nursing Jail Defendants did not proximately cause Thompson's death. Specifically, the Nursing Jail Defendants quote Plaintiffs as stating that "defendants other than the nursing defendants addressed in ¶ 34 . . . failed to provide Mr. Thompson with manifestly necessary and ultimately life-saving care." Dkt. 79 at 8. Nursing Jail Defendants misrepresent this quotation. The full excerpt, with the information omitted by the Nursing Jail Defendants by way of ellipsis, reads "defendants other than the nursing defendants addressed in ¶ 34 supra *similarly* failed to provide Mr. Thompson with manifestly necessary and ultimately life-saving care." Dkt 71 ¶ 36 (emphasis added). The inclusion of "similarly" includes the Nursing Jail Defendants (who are named and addressed in ¶ 34) as failing to provide life-saving care. Additionally, judges in this District have found that similar nursing failures to timely treat patients constituted breaches of their duty. *See, e.g.*, *Washington v. Brooks*, 2021 WL 4975268, at *4 (E.D. Va. Oct. 26, 2021) (writing that failures to timely treat plaintiff's medical needs and failure to provide plaintiff with adequate nutrition were "alleged breach[es] of the duty of care to a specific patient that sounds in medical malpractice").

Furthermore, the Court notes that the proper legal standard is whether the Nursing Jail Defendants "proximately caused the plaintiffs injuries." *Bryan*, 254 Va. at 34; *Raines*, 231 Va. at 113. Plaintiffs here assert that the improper treatment of Thompson "materially contributed to Mr. Thompson's suffering and death." Dkt. 71 ¶ 45. Considering that all inferences are drawn in favor of the Plaintiffs at the motion to dismiss stage, the Court finds that Plaintiffs have plausibly pleaded

that Thompson's health was dire and the Defendants' lack of treatment caused Thompson suffering. Therefore, the Court finds that Plaintiffs sufficiently asserted causation and plausibly alleged medical malpractice.

B. Mediko

Defendant Mediko seeks to dismiss Counts V (Unconstitutional Failure to Train under the Fourteenth Amendment), VII (Respondeat Superior), and X (Mental Health Disability under the Affordable Care Act and Rehabilitation Act). Dkt. 79 at 17. Mediko is the corporation licensed and at relevant times under contract to provide for-profit health care to jail inmates. Dkt. 71 ¶ 4.

1. Unconstitutional Failure to Train under the Fourteenth Amendment Claim

A plaintiff can establish the requisite "policy" for Monell liability through a failure to train, if it "reflects a 'deliberate' or 'conscious' choice" to not do so. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). A plaintiff must point out "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training." *Id.*; *see also, e.g.*, *McDowell v. Grimes*, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018). Second, a plaintiff must establish that the municipality's failure to train showed a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original). Deliberate indifference is shown if "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights." *Harris*, 489 U.S. at 390; *accord. Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994). Finally, a plaintiff must show that "the officer's conduct resulted from said training," or lack

thereof. *McDowell*, 2018 WL 3756727, at *4 (quoting *Jones v. Chapman*, 2015 WL 4509871, at *18 (D. Md. July 24, 2015)).

As to Mediko's failure to train, Plaintiffs allege that Mediko failed to properly train employees on how to provide health care to "uncooperative, mentally ill patients." Dkt. 71 ¶ 47. Further, Plaintiffs specifically allege that Mediko employees were not properly trained on what steps to take to take to acquire a TDO or secure treatment for a patient who had to be transferred to a hospital for care. *See id.* ¶ 38 (alleging that Mediko staff, due to a lack of appropriate training, did not know "who should apply for a new TDO, or how to do so, or what their several options were for securing an involuntary placement of . . . Thompson in light of his refusal of necessary medication due to his mental illness"). Because Plaintiffs have alleged that Mediko failed to train its employees on how to secure necessary medical care in this way, Plaintiffs are able to point to a "specific deficiency" in training. Further, from the face of the Complaint, it is clear to the Court that the Meeting Participant Defendants,[21] all Mediko employees, lacked training that made it extremely likely that an inmate suffering from an immediate medical crisis like Thompson would not be transferred to an appropriate medical facility because the employees did not know who should fill out the paperwork. *Id.* ¶ 39 (asserting that the doctor asked Graham to fill out the required form, despite the form requiring certain sections to be completed by a doctor); *id.* ¶ 40 (alleging that Graham sent the partially completed form to Cassidy, also not a doctor, despite the form requiring certain sections to be completed by a doctor); *id.* ¶ 41 (asserting that the form was never completed). This Court previously rejected this argument, and the filing of an Amended Complaint has not altered this Court's conclusion in this regard. Dkt. 69 at 28-29. Lack of

[21] Dr. Ijeh, Dr. Nunez, Mark Cassidy, and Dr. Ayales are referred to as the Meeting Participant Defendants.

knowledge to complete such a rudimentary task shows deliberate indifference on the part of Mediko. Accordingly, Plaintiffs have adequately stated a claim for relief under Section 1983 as to failure to train against Mediko.

2. Liability under *Respondeat Superior*

Next, Plaintiffs assert that Mediko is liable under the doctrine of *respondeat superior* for the consequences of the state law torts, *i.e.*, medical malpractice, negligence, and gross negligence, of their respective employees. Dkt. 71 ¶ 48. Plaintiffs may recover damages against an actor's employers through the doctrine of *respondeat superior* "for the tortious acts of his employee if the employee was performing his employer's business and acting within the scope of his employment." *Kensington Assocs. v. West*, 234 Va. 430, 432 (1987). Here, Mediko's claim rises and falls with the claims against the Mediko Jail Defendants and the Meeting Participant Defendants. As the Court has previously determined that Plaintiffs have stated a claim against the Meeting Participant Defendants (Dkt. 69), and because it is clear that the Meeting Participant Defendants were acting within the scope of their employment, Plaintiffs have stated a claim for negligence, gross negligence, and medical malpractice under a theory of *respondeat superior* against Mediko. *See Riddick*, 503 F. Supp. 3d at 432 (concluding that claims against employer survived motion to dismiss). Accordingly, the Mediko Motion will be denied in this regard.

3. ACA Claim

Lastly, Plaintiffs allege an Affordable Care Act ("ACA")/Rehabilitation Act ("RA") claim against Mediko, asserting that Mediko acted as an agent of the state and received federal financial assistance but failed to safeguard Thompson's health due to his mental disability. Dkt. 71 ¶ 49.

To state a claim for discrimination under the ACA or RA, a plaintiff must allege that he (1) has a disability, (2) is otherwise qualified to receive a public service, program, or activity, and (3)

was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). A plaintiff "need not show 'discriminatory animus' to prevail on a claim for damages under Title II of the ADA or § 504 of the Rehabilitation Act." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 405 (D. Md. 2011) (citing *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir. 1994)). Disability discrimination includes both "deprivations based on prejudice, stereotypes, or unfounded fear," *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 (1987), as well as "'thoughtless[ ] and indifferent[ ]' discrimination, which arises not out of 'invidious animus' but rather out 'of benign neglect.'" *Basta v. Novant Health Inc.*, 56 F.4th 307, 315 (4th Cir. 2022) (quoting *Alexander v. Choate*, 469 U.S. 287, 295 (1985)).

This Court previously found that Thompson suffered from a mental disability. Dkt. 69 at 23. A "disability" under the RA is a "physical or mental impairment that substantially limits one or more major life activities of an individual; a record of such impairment; or being regarded as having such an impairment[.]" *Biniaris v. Hansel Union Consulting, PLLC*, 382 F. Supp. 3d 467, 472 (E.D. Va. 2019) (citing 42 U.S.C. § 12102(1); 29 U.S.C. § 705(9)(B)). Here, the Complaint establishes that Dr. Prasad noted that Thompson "[a]ppeared to have a long history of schizophrenia," was "poorly interactive," had a "paranoid disorder" and a "delusion disorder." Dkt. 71 ¶¶ 16-18. Thompson's mental condition led him to refuse his medication. *Id.* ¶ 49. This is sufficient to allege disability under the ACA.

Despite having knowledge of Thompson's disability and the inability of staff at the jail to further assess Thompson, Thompson went approximately eleven days without receiving necessary medication. Again, the face of the Amended Complaint makes clear that this was due to Mediko's

employees' failure to act in the face of his mental disability and inability to complete the requisite paperwork to assist Thompson in obtaining his medication like other prisoners. *See Basta*, 56 F.4th at 315 (noting that discrimination under the ACA and/or RA may arise out of "benign neglect"). Accordingly, Mediko's Motion to Dismiss will again be denied in this regard.

C. VHC Motion

Defendants Virginia Hospital Center Physician Group, LLC ("VHC Physician Group"), Arlington Health System ("VHC AHS"), and Dr. Jeanie Yoon ("Dr. Yoon") (collectively, the "Hospital Defendants") seek to dismiss each of the claims against them.[22] Specifically, the Hospital Defendants argue that Plaintiffs' medical malpractice claim against Dr. Yoon should be dismissed because Plaintiffs do not plausibly allege that Dr. Yoon caused Thompson's death and that the gross negligence claim should be dismissed because Dr. Yoon provided at least some degree of care to Thompson. The Hospital Defendants further assert that the ACA disability discrimination claims should be dismissed because Plaintiffs do not sufficiently state a claim of disability discrimination and that the alleged inadequate medical treatment is not ACA discrimination. *See* Dkt. 78.

1. Gross Negligence

As previously discussed, Virginia law defines gross negligence as "a heedless and palpable violation of legal duty respecting the rights of others which amounts to the absence of slight

[22] Plaintiffs assert a medical malpractice claim against Dr. Yoon in Count III. From the Amended Complaint, it is unclear whether Plaintiff intended to assert a standalone claim of gross negligence against Dr. Yoon in Count III as well. Plaintiffs write "[t]he discharge, *sans* provision for ongoing involuntary treatment, was unfathomable, baseless, reckless, professionally substandard, negligent, *grossly negligent*, and amounted to medical malpractice." Dkt. 71 ¶ 46 (emphasis added). As Defendants moved to dismiss a claim for gross negligence, the Court will address gross negligence. Plaintiffs further assert a wrongful death claim against Dr. Yoon in Count IV (as previously disposed of by this Court). Plaintiffs additionally allege claims under the Affordable Care Act ("ACA") against all the Hospital Defendants in Counts XI, XII, and XIII.

diligence, or the want of even scant care. *Commonwealth*, 295 Va. at 613 (quoting *Chapman*, 252 Va. at 190). "The standard for gross negligence [in Virginia] is one of indifference, not inadequacy." *Elliott*, 292 Va. at 622. The Hospital Defendants assert that Dr. Yoon provided a degree of care to Thompson by prescribing Thompson five days of medication. Dkt. 78 at 7. Plaintiffs, on the other hand, believe that Dr. Yoon's prescription of oral medicine to Thompson, who was known to reject oral medication, was futile and did not provide actual care to Thompson. Dkt. 85 at 12. Based on the allegations here, Dr. Yoon is alleged to have provided at least some degree of care to Thompson.

Here, Dr. Yoon discharged Thompson back to jail with five days of oral antibiotics. Dkt. 71 ¶ 1. The Amended Complaint notes that Dr. Yoon prescribed the five days of medication "in order to safeguard Mr. Thompson's health if not his life." *Id.* ¶ 20. Additionally, Plaintiffs plead, on information and belief, Dr. Yoon was on notice of Thompson's medicine refusals and reviewed nurses' notes regarding Thompson's case. *Id.* ¶ 22. Dr. Yoon also consulted with another doctor "for input on mental health issues related to Mr. Thompson's status and treatment." *Id.* ¶ 21. Although Dr. Yoon's care may have been insufficient, "[t]he standard for gross negligence [in Virginia] is one of indifference, not inadequacy." *Elliott*, 292 Va. at 622. Indeed, this Court has previously dismissed similar claims rest on the adequacy of the care provided. *See J.M.H. v. Prince William Cnty. Sch. Bd.*, 2026 WL 701353, at *6 (E.D. Va. Mar. 12, 2026). By prescribing Thompson medication and consulting with another doctor about Thompson's case, Dr. Yoon displayed at least some degree of care towards Thompson. Thus, the gross negligence claims against Dr. Yoon will be dismissed.

2. Medical Malpractice

As established earlier, Virginia tort law applies to the medical malpractice claims brought in this action. To prove a medical malpractice claim in Virginia, a plaintiff must establish (1) the applicable standard of care, (2) a deviation from that standard, and (3) that such deviation proximately caused the plaintiff's injuries. *See Bryan*, 254 Va. at 34 (1997); *Raines*, 231 Va. at 113. Specifically, "[i]n medical malpractice cases, as in other malpractice cases, the plaintiff must establish not only that the defendant violated the applicable standard of case, and was therefore negligent, but [they] must also sustain the burden of showing that the negligent acts constituted a proximate cause of the injury or death." *Brown*, 331 S.E.2d at 446.

The contours of Plaintiffs' claims in this regard are unclear. As with the original Complaint, the Court is unsure whether Plaintiffs are alleging that Dr. Yoon committed medical malpractice based solely on the failure to obtain a second TDO or whether Plaintiffs' additionally intended to allege, as a standalone basis for the claim, Dr. Yoon's "incomprehensibl[e] discharge [of] Mr. Thompson back to the jail whence he had come, with oral medication he would not take as . . . in fact occurred both at the jail and at the hospital." Dkt. 71 ¶ 41.

The Court finds that, to the extent the claim hinges on a second TDO, Plaintiffs have not sufficiently pleaded beyond a speculative level that the TDO would have been extended. Plaintiffs allege that Dr. Yoon "could and should have insisted on an extension of court-ordered involuntary medication to safeguard her patient Mr. Thompson and thereby reduce the known risk of an adverse medical outcome for him." Dkt. 71 ¶ 24. Plaintiffs plead that Dr. Yoon could have gotten an extension by "invoking the procedures available under any of several Virginia statutes providing for court-ordered involuntary treatment of at-risk patients . . .". *Id.* However, Plaintiffs assertions are vague and speculative. Namely, Plaintiffs do not specify which Virginia statutes

they are relying on to support the basis that Dr. Yoon's TDO would have been extended.[23] Because the Amended Complaint only references "any of several Virginia statutes," Plaintiffs claims rests on an unspecified legal foundation.

Moreover, regardless of whether the claim is intended to rest on the failure to obtain another TDO or extend the TDO or on the discharge of Thompson to ADC, Plaintiffs do not identify the applicable standard of care in this regard. Thus, the claim as pleaded is speculative and must be dismissed.

3. ACA Claims Against the Doctor Hospital Defendants

Plaintiffs also assert claims under the ACA against Dr. Yoon and VHC Physician Group (collectively, the "Doctor Hospital Defendants"). Dkt. 71 ¶ 51. Plaintiffs allege that the Doctor Hospital Defendants, in violation of the ACA and the RA, "(a) ignored the non-administration of medication that . . . Thompson required according to hospital doctors' orders, (b) took no steps to secure the ongoing involuntary medication of . . . Thompson known to be required for his physical health, and (c) knowingly acquiesced in . . . Thompson's being prematurely dumped as a patient to a jail where they knew he had not been, and could and would not be, properly treated," because of Thompson's mental disability. *Id.*

The antidiscrimination provision of the ACA states: "an individual shall not, on the ground prohibited under . . . [Section 504 of the Rehabilitation Act], be excluded from participation in, be denied the benefits of, or be subject to discrimination under, any health program or activity, any

---

[23] Plaintiffs, in their Memorandum in Opposition to the VHC Motion, specify that Code of Va. §37.2-1001(G) supports their claim that the TDO would have been extended. Dkt. 86. However, "it is axiomatic that a Plaintiff may not amend their complaint through an opposition brief." *Oku v. Trumbull Ins. Co.*, 2026 WL 801263, at *3 (E.D. Va. Mar. 23, 2026). Thus, the fact that Plaintiffs specified which Virginia Code they were referencing in their Opposition does not change the fact that their pleadings in the Amended Complaint were too vague and speculative to continue forward.

part of which is receiving Federal financial assistance[.]" 42 U.S.C. § 18116(a). The ACA thus incorporates discrimination claims under the RA. The RA prohibits discrimination against a qualified individual "solely by reason of her or his disability." 29 U.S.C. § 794. To state a claim for discrimination under the RA or ACA, a plaintiff must allege that he (1) has a disability, (2) is otherwise qualified to receive a public service, program, or activity, and (3) was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability. *Constantine*, 411 F.3d at 498; *see also* 42 U.S.C. § 18116(a). A plaintiff "need not show 'discriminatory animus' to prevail on a claim for damages under Title II of the ADA or § 504 of the Rehabilitation Act." *Paulone*, 787 F. Supp. 2d at 405 (citing *Pandazides*, 13 F.3d at 830 n.9). Disability discrimination includes both "deprivations based on prejudice, stereotypes, or unfounded fear," *Arline*, 480 U.S. at 287, as well as "'thoughtless[ ] and indifferent[ ]' discrimination, which arises not out of 'invidious animus' but rather out 'of benign neglect.'" *Basta v*, 56 F.4th at 315.

This Court has already found, *supra*, that Plaintiffs have plausibly alleged that Thompson suffered from a mental disability for purposes of the ACA and RA. Additionally, consistent with this Court's previous holding, Plaintiffs have plausibly alleged a claim premised on the allegation that the Doctor Hospital Defendants "ignored the non-administration of medication that Mr. Thompson required according to hospital doctors' orders." Dkt. 71 ¶¶ 16-18. In this regard, the Doctor Hospital Defendants were aware of the TDO, knew that the TDO was issued on the basis of Thompson's mental incapacity, further diagnosed Thompson as mentally incapable, prescribed medication, knew that the medication was being refused, and failed to utilize the TDO to administer medication. The failure to utilize the TDO in order to ensure that Thompson would receive medication in the same way that a non-mentally disabled person would receive medication

is sufficient to state an ACA claim. *Johnson v. Rappahannock Reg'l Jail Auth.*, 2024 WL 2882869, at *8 (E.D. Va. June 7, 2024) (finding that plaintiffs plausibly stated an ACA/RA claim by alleging defendants ignored plaintiff's requests for assistance due to her schizoaffective disorder). Thus, Plaintiffs have sufficiently stated a claim for relief under the ACA at this stage. *See Basta*, 56 F.4th at 315 (noting that discrimination under the ACA and/or RA may arise out of "benign neglect"). Thus, the VHC Motion will be denied in this regard.

3. ACA Claim Against VHC AHS

Plaintiffs allege the same ACA and RA claims as to VHC AHS. In addition to the allegations as stated above, Plaintiffs additionally allege that during Thompson's stay in the hospital, despite the TDO, "staff nurses charged to administer medication to . . . Thompson repeatedly failed to do so simply because . . . Thompson objected. . . . They noted . . . Thompson's refusals in his medical chart." Dkt. 71 ¶ 22.

At the motion to dismiss phase, Plaintiffs have plausibly alleged that the hospital nurses' apparent neglect or avoidance of Thompson, by way of failing to properly administer his medication, was because of his mental disability and his resulting difficult demeanor. For the same reasons as for the Doctor Hospital Defendants, this is sufficient to state a claim at the motion to dismiss stage. *See Johnson*, 2024 WL 2882869, at *8; *see also Basta*, 56 F.4th at 315 (noting that discrimination under the ACA and/or RA may arise out of "benign neglect"). Accordingly, the Court will allow Plaintiffs' claim against VHC AHS for violation of the ACA to go forward.

IV. CONCLUSION

Again, the Court notes that, although there may be facts revealed in discovery that affect the determinations reached here regarding deliberate indifference, negligence, medical malpractice, and the ACA, Plaintiffs have, in large part, plausibly alleged claims against the

Defendants. In the prior Memorandum Opinion and Order, the Court indicated that no further amendments would be permitted. Dkt. 69 at 32. Here, the Amended Complaint largely survives, but it appears that further amendment of the counts that have been dismissed would be futile.

Accordingly, it is hereby ORDERED that Defendants VHC Physician Group, VHC AHS, and Dr. Jeanie Yoon's Motion to Dismiss (Dkt. 78) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is granted insofar as the medical malpractice claims against Defendant Dr. Yoon are dismissed in Count III. The Motion is otherwise denied; and it is

FURTHER ORDERED that the Mediko Defendants' Motion to Dismiss (Dkt. 77) is DENIED; and it is

FURTHER ORDERED that the Motion for Leave (Dkt. 89) is GRANTED; and it is

FURTHER ORDERED that a scheduling order will issue promptly.

It is SO ORDERED.

Alexandria, Virginia
August 27, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge